**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE ___OCT 3 1 2013___

_for_ CHIEF JUSTICE

This opinion was filed for record
at _8:00 a m_ on _Oct 31 2013_

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 87726-2 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| BAO DINH DANG, | ) | |
| | ) | Filed ___OCT 3 1 2013___ |
| Petitioner. | ) | |
| | ) | |

WIGGINS, J.—In this case, we must determine whether trial courts are required to enter a finding of dangerousness before revoking the conditional release of a person acquitted of a crime by reason of insanity. We must also decide the appropriate standard of proof governing the revocation determination. We conclude that consistent with due process principles, our statutory scheme governing insanity acquittals, chapter 10.77 RCW, requires trial courts to find conditionally released insanity acquittees dangerous before committing them to mental institutions against their will. We also conclude that a preponderance of the evidence sufficiently protects an insanity acquittee's rights in the context of revoking conditional release. Because the trial court in this case specifically determined that Bao Dinh Dang was dangerous, we hold that it properly revoked his conditional release. We thus affirm the Court of Appeals but on different grounds. We hold that the trial court erred in

admitting hearsay statements at Dang's revocation hearing without finding good cause for doing so but that the error was harmless beyond a reasonable doubt.

FACTS AND PROCEDURAL HISTORY

In November 2006, Dang walked up to a gas pump at a Seattle Chevron station, lit newspaper on fire, and attempted to pump gas in order to ignite the gas supply. A Chevron employee successfully knocked the flaming newspaper out of Dang's hand with a window-washing squeegee while a gas station customer phoned police. Dang was arrested, and the State charged him with attempted arson in the first degree.

Dang moved for acquittal on the grounds of insanity. The court granted Dang's motion, finding that Dang was suffering from a mental disease but that Dang was "not a substantial danger to other persons and does not now present a substantial likelihood of committing felonious acts jeopardizing public safety or security, but . . . is in need of further control by the court or other persons or institutions." Clerk's Papers (CP) at 8.

In the same order granting Dang's motion for acquittal by reason of insanity, the court ordered Dang conditionally released subject to various conditions, including the assignment of a Department of Corrections (DOC) probation officer, a requirement that Dang live with his mother and remain in Washington, and prohibitions against possessing explosives, breaking additional laws, and consuming alcohol. The order granting conditional release also required Dang to seek psychiatric treatment at Harborview Medical Center and to follow all treatment recommendations and to remain under the supervision of the secretary of the DOC

by reporting to a community corrections officer (CCO). Finally, the order stated that Dang's conditional release was contingent on being in a state of remission from the effects of mental disease and on having no significant deterioration of his mental condition.

Dang's conditional release was thereafter modified a few more times to require semiannual reports by the supervising CCO, to change Dang's residence from his mother's Seattle home to his sister's home in California, and to ensure compliance with treatment. Aside from these modifications, Dang's conditional release proceeded without incident. Given Dang's compliance with the terms of conditional release, the trial court permitted Dang to travel to Vietnam for one month in the summer of 2008.

Following his return from Vietnam, Dang's CCO and Harborview case manager noted that Dang was exhibiting signs of depression and paranoia. Dang's CCO received word from the Harborview case manager that Dang had stated that he was not taking medication and felt like setting a gas station on fire. In addition, Dang's case manager and CCO noted that Dang was experiencing delusions with respect to his mother's power and control over him and that Dang had alluded to doing "something big." Report of Proceedings (RP) at 48. Dang was taken to Harborview Mental Health Services, recanted his statements, and was released.

In light of the concerns expressed by Dang's CCO and case manager, the State moved for an order to issue a bench warrant for Dang's arrest and commitment pending a hearing on Dang's conditional release. The court issued a bench warrant ordering Dang committed for evaluation and treatment.

Following arrest, Dang was placed in Western State Hospital for evaluation. During this period, the Department of Social and Health Services (DSHS) issued several reports regarding Dang's mental health. Each report outlined Dang's treatment and recommended that Dang not return to the community because he remained at risk for future violent and criminal behavior.

After extensive evaluation at Western State Hospital, the State moved to revoke Dang's conditional release. The trial court then heard testimony of Dang's CCO, the Harborview case manager, a DSHS psychologist, Dang's mother, and Dang. Several of the witnesses testified that Dang's mental health condition had deteriorated and that Dang should remain hospitalized.

Following the hearing, the court revoked Dang's conditional release. Dang appealed. While Dang's appeal was pending, the trial court issued findings of fact and conclusions of law supporting the order revoking conditional release. Among other findings, the court determined that Dang's mental disease did not remain in a state of remission and that Dang could not be conditionally released without presenting a substantial danger to others and a substantial likelihood of committing criminal acts jeopardizing public safety.

The Court of Appeals affirmed the trial court's revocation of Dang's conditional release. *State v. Bao Dinh Dang*, 168 Wn. App. 480, 488, 280 P.3d 1118 (2012). It determined that revocation of Dang's conditional release was proper based on Dang's nonadherence to the terms and conditions of release and that a specific finding of dangerousness was not required. *Id.* at 484. The Court of Appeals also determined that preponderance of the evidence, rather than clear, cogent, and

4

convincing evidence, was the appropriate standard of proof for determining revocation of conditional release under the insanity acquittal statute. *Id.* at 486. Finally, the Court of Appeals held that the cases establishing limited due process rights to confront and cross-examine witnesses in similar revocation hearings prohibited only documentary hearsay, not hearsay admitted through live testimony. We granted review. *State v. Bao Dinh Dang*, 175 Wn.2d 1023, 291 P.3d 253 (2012).

## STANDARD OF REVIEW

"'We review questions of statutory interpretation de novo.'" *State v. Veliz*, 176 Wn.2d 849, 853-54, 298 P.3d 75 (2013) (quoting *State v. Morales*, 173 Wn.2d 560, 567 n.3, 269 P.3d 263 (2012)). Constitutional issues are questions of law that we also review de novo. *State v. Gresham*, 173 Wn.2d 405, 419, 269 P.3d 207 (2012).

## ANALYSIS

We affirm the Court of Appeals and hold that Dang's conditional release was properly revoked by the trial court.

First, we hold that the trial court properly revoked Dang's conditional release because it actually found Dang dangerous. But contrary to the Court of Appeals' holding, we conclude that failure to adhere to the terms and conditions of conditional release alone is not sufficient to revoke conditional release. Rather, the constitution requires a specific finding of dangerousness before ordering the confinement of an insanity acquittee.

Second, we conclude that preponderance of the evidence, rather than clear, cogent, and convincing evidence, is the appropriate standard of proof in determining

5

the revocation of conditional release. The heightened standard required for civil commitments is simply not necessary in the insanity acquittal context.

Finally, unlike the Court of Appeals, we conclude that the trial court erred in admitting hearsay evidence against Dang at the hearing on revocation of conditional release. Limited due process rights require the trial court to find good cause to admit hearsay based on the difficulty and expense of procuring witnesses and the reliability of the evidence in question. But because ample evidence supported the trial court's finding that Dang was dangerous, the trial court's error was harmless beyond a reasonable doubt.

I. The revocation of Dang's conditional release complied with the statutes and comported with due process of law

The revocation of Dang's conditional release was both statutorily and constitutionally sound. Although the Court of Appeals erroneously interpreted RCW 10.77.190(4) to permit confinement without a specific finding of dangerousness, the trial court did determine that Dang was dangerous when it revoked his conditional release. Therefore, we affirm the Court of Appeals' holding that the trial court properly revoked Dang's conditional release. However, contrary to the Court of Appeals' analysis, we hold that a dangerousness finding is constitutionally required to revoke conditional release under Washington's insanity acquittal scheme.

A. *Involuntary commitment of a person acquitted by reason of insanity requires a finding that the acquittee is dangerous*

In the context of involuntary commitment, mental illness alone is not enough to restrict an individual's liberty interest in remaining free of government

6

confinement. The individual must also be a danger to others or present a threat to public safety. As the United States Supreme Court has stated,

> A finding of "mental illness" alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.

*O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975). The Supreme Court's determination that mental illness *and* dangerousness must both underpin an involuntary commitment has been repeatedly reaffirmed. *See Foucha v. Louisiana*, 504 U.S. 71, 77, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992) (holding that as a matter of due process, an insanity acquittee "may be held as long as he is both mentally ill and dangerous, but no longer"); *Jones v. United States*, 463 U.S. 354, 368, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983) ("The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous.").

This court too has made clear that an involuntary commitment requires a dangerousness finding. *See State v. Klein*, 156 Wn.2d 102, 121, 124 P.3d 644 (2005) ("An insanity acquittee must be released if he or she is no longer dangerous, regardless of the presence of a mental disease or defect."); *State v. Reid*, 144 Wn.2d 621, 631, 30 P.3d 465 (2001) (holding that insanity acquittee may be committed to a mental institution "so long as he is both mentally ill and dangerous as a result of that mental illness, but no longer"); *In re Det. of LaBelle*, 107 Wn.2d 196, 201, 728 P.2d 138 (1986) (holding mental illness alone is not a constitutionally adequate basis for involuntary commitment).

In short, in order to confine an insanity acquittee to institutionalization against his or her will, the trial court must make two determinations: first, that the acquittee suffers from a mental illness and second, that the acquittee is a danger to others.

*B. The trial court determined Dang was dangerous when it ordered revocation of his conditional release*

In this case, the trial court determined that Dang was dangerous when it revoked his conditional release. Accordingly, we hold that the revocation of Dang's conditional release complied with both statutory and constitutional law.

When Dang was acquitted by reason of insanity, the trial court determined that Dang was "not a substantial danger to other persons and [did not] present a substantial likelihood of committing felonious acts jeopardizing the public safety or security, but that [Dang was] in need of further control by the court or other persons or institutions." CP at 7. Because the trial court specifically found that Dang was not dangerous, it ordered Dang conditionally released pursuant to RCW 10.77.110(3).

Because Dang had never been found dangerous—indeed, his conditional release required a specific finding of nondangerousness—the trial court was required to find Dang dangerous to revoke his conditional release. The trial court did so in its "Findings of Fact and Conclusions of Law on Order Revoking Conditional Release," stating that Dang could not "be conditionally released without presenting a substantial danger to other persons" and that Dang presented "a substantial likelihood of committing criminal acts jeopardizing public safety and security." CP at 88. Thus, the trial court actually determined that Dang was dangerous when it made its revocation determination under RCW 10.77.190(4). The revocation of Dang's

8

conditional release and his commitment to Western State Hospital were therefore constitutionally sustainable.

### C. The Court of Appeals' interpretation of RCW 10.77.190(4) neglects the constitutional requirement of dangerousness

The Court of Appeals interpreted RCW 10.77.190(4) to allow revocation of conditional release on the sole basis of nonadherence to the terms and conditions of release. *Bao Dinh Dang*, 168 Wn. App. at 484. Specifically, the Court of Appeals stated that "[g]iven that the trial court found that Dang did not adhere to the terms and conditions of his release, revocation of his conditional release based on that finding alone was proper." *Id.* Because this interpretation of RCW 10.77.190(4) does away with the constitutional requirement of a dangerousness finding, we reject it. Instead, we interpret RCW 10.77.190(4) in a manner that upholds its constitutionality and that examines the provision in the context of chapter 10.77 RCW.

"'Wherever possible, it is the duty of this court to construe a statute so as to uphold its constitutionality.'" *In re Pers. Restraint of Matteson*, 142 Wn.2d 298, 307, 12 P.3d 585 (2000) (quoting *Addleman v. Bd. of Prison Terms & Paroles*, 107 Wn.2d 503, 510, 730 P.2d 1327 (1986) (internal quotation marks omitted)). When we interpret statutes, we construe their meaning by reading them in relation with other statutes. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). By examining RCW 10.77.190(4) in the context of other provisions of chapter 10.77 RCW, it is possible to interpret RCW 10.77.190(4) to uphold its constitutionality.

9

RCW 10.77.190(4) provides,

> The court, upon receiving notification of the apprehension, shall promptly schedule a hearing. The issue to be determined is whether the conditionally released person did or did not adhere to the terms and conditions of his or her release, or whether the person presents a threat to public safety. Pursuant to the determination of the court upon such hearing, the conditionally released person shall either continue to be conditionally released on the same or modified conditions or his or her conditional release shall be revoked and he or she shall be committed subject to release only in accordance with provisions of this chapter.

Dissecting this statute, the trial court can make one of three possible findings: (1) the conditionally released person adhered to the terms and conditions of release, (2) the conditionally released person did not adhere to the terms and conditions of release, or (3) the conditionally released person presents a threat to public safety. Depending on which determination the trial court makes, three outcomes can result: (1) continued conditional release on the same conditions, (2) continued conditional release on modified conditions, or (3) revocation of conditional release and commitment. To determine which findings permissibly lead to which outcomes, we must look to the rest of the statutory scheme.

From other provisions in chapter 10.77 RCW, it is clear that a person cannot be committed initially absent a finding that the person "is a substantial danger to other persons, or presents a substantial likelihood of committing criminal acts jeopardizing public safety or security." RCW 10.77.110(1). Upon a petition for release from commitment, the court may hold a hearing at which the issue to be determined is "whether or not the person may be released conditionally without substantial danger to other persons, or substantial likelihood of committing criminal

10

acts jeopardizing public safety or security." RCW 10.77.150(3)(c). Although these statutes do not spell it out explicitly, they indicate that an insanity acquittee must be released—wholly or conditionally—unless release would result in a danger to others.

Other statutes in chapter 10.77 RCW support this conclusion as well. For example, when a committed person is about to be released on temporary furlough, "the prosecuting attorney may seek a temporary restraining order to prevent the release of the person on the grounds that the person is dangerous to self or others." RCW 10.77.163(3). This supports a reading that only a dangerous person may be confined. Similarly, in order to obtain full release from commitment, the insanity acquittee must prove that he or she "no longer presents . . . a substantial danger to other persons, or a substantial likelihood of committing criminal acts jeopardizing public safety or security." Former RCW 10.77.200(3) (2000).

These related statutory provisions demonstrate that the legislature did not intend to involuntarily confine insanity acquittees without a judge determining that they are dangerous. We interpret RCW 10.77.190(4) consistently with this intent. RCW 10.77.190(4) states that "[p]ursuant to the determination of the court upon such [conditional release revocation] hearing" that the acquittee adhered to conditions, did not adhere to conditions, or presents a public safety threat, the court shall make a ruling to continue the acquittee on conditional release, modify the terms of conditional release, or revoke conditional release. The ruling that the trial court makes therefore depends entirely on what it determines. *Id.* Thus, if the court determines that the insanity acquittee adhered to the terms or conditions of release, then it should continue release on the same conditions. If the court determines that

there was no adherence to the terms and conditions, then it may either continue release on the same conditions or modify the conditions. Following this logic, in order to uphold the statute's constitutionality, we hold that only when the trial court determines that an insanity acquittee presents a threat to public safety may the trial court rule to revoke conditional release.

This interpretation of the statute comports with the constitutional requirement that an insanity acquittee must be dangerous to be committed. Because RCW 10.77.190(4) is capable of a constitutional interpretation, we reject the Court of Appeals' interpretation that does away with the constitutional requirement that the trial court find dangerousness.

D. *The State's proposed distinction between commitment status and commitment disposition is not supported by the insanity acquittal statutes*

The State distinguishes between a commitment status and a commitment disposition to assert that Dang has already been assigned the status of committed and has therefore already been found dangerous. Under this theory, the court's determination of whether Dang is entitled to total confinement or conditional release only concerns his commitment disposition and thus does not require another finding of dangerousness. This interpretation finds no support in the language of RCW 10.77.110.

As already discussed, RCW 10.77.110 gives the court three options after granting a defendant's motions for acquittal on the grounds of insanity. The court may find the defendant not dangerous and release. RCW 10.77.110(1). The court may find the defendant dangerous and confine. *Id.* Or the court may determine that

the defendant is not dangerous but in need of supervision and conditionally release. RCW 10.77.110(3). Only if the defendant is found dangerous may the trial court order confinement. The statute plainly states that only a nondangerous insanity acquittee may be conditionally released. Thus, the State's assertion that all insanity acquittees are relegated to "commitment status" and therefore presumed dangerous ignores the text of RCW 10.77.110. Here, immediately following Dang's motion for acquittal on the grounds of insanity, the court determined Dang was nondangerous and conditionally released him. We therefore reject the State's proposed interpretation of RCW 10.77.110 that presumes that, by virtue his acquittal, Dang was dangerous.

II.  **A preponderance of the evidence standard is the appropriate standard of proof for revoking an insanity acquittee's conditional release**

Dang argues that we should adopt a clear, cogent, and convincing evidence standard to revoke an insanity acquittee's conditional release. We decline to do so because of the significant differences between civil commitment and commitment following an insanity acquittal.

This court has recognized that the differences between civilly committed persons and insanity acquittees warrant different levels of procedural protections. *See Alter v. Morris*, 85 Wn.2d 414, 419-20, 536 P.2d 630 (1975) (upholding different procedural treatment of persons committed civilly and persons committed following acquittal on insanity grounds), *abrogated on other grounds by In re Pers. Restraint of Harris*, 94 Wn.2d 430, 436, 617 P.2d 739 (1980). Although due process requires clear and convincing evidence to support a person's civil commitment, *Addington v.*

*Texas*, 441 U.S. 418, 433, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979), this is largely due to the risk that "a factfinder might decide to commit an individual based solely on a few isolated instances of unusual conduct," *id.* at 427. Because civil confinement requires something "more serious than is demonstrated by idiosyncratic behavior," the Supreme Court opted to employ a standard of proof more stringent than preponderance. *Id.*

The concerns raised in *Addington* are not present in the context of a commitment following acquittal by reason of insanity. As the United States Supreme Court has recognized in construing the District of Columbia's insanity acquittal statute, "commitment . . . follows only if the *acquittee himself* advances insanity as a defense and proves that his criminal act was a product of his mental illness." *Jones*, 463 U.S. at 367. Thus, the criminal defendant's choice to pursue an insanity defense is "good reason for diminished concern as to the risk of error." *Id.* Moreover, in the criminal insanity context, there is no risk that mere "'idiosyncratic behavior'" will form the basis of commitment; instead, it is the criminal act itself that is "not 'within a range of conduct that is generally acceptable.'" *Id.* (quoting *Addington*, 441 U.S. at 426-27). Because there is less risk of commitment error in the insanity acquittal context, there is also less need to employ a heightened standard of proof. Accordingly, we conclude that a preponderance of the evidence is the proper standard of proof in revoking an insanity acquittee's conditional release.

III.   Although the trial court erred in admitting hearsay evidence without good cause, the error was harmless

It was error for the trial court to admit hearsay evidence during the revocation hearing without a good cause finding for doing so. However, in light of the extensive nonhearsay evidence presented at the hearing that supported a dangerousness finding, the trial court's error was harmless beyond a reasonable doubt.

*A. Limited due process rights at revocation hearings require a good cause finding before admitting hearsay*

When confronted with revocation of a qualified or conditional liberty, the United States Supreme Court has indicated that limited Fourteenth Amendment due process guaranties apply. *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). These rights include the right to confront and cross-examine witnesses unless there is articulable good cause for disallowing confrontation. *Id.* at 489. Although *Morrissey* involved the revocation of parole, *id.* at 477-78, this court has applied its limited due process rights in other contexts. *See, e.g., State v. Abd-Rahmaan*, 154 Wn.2d 280, 283, 111 P.3d 1157 (2005) (sentencing modification hearing due to violations of community custody terms and conditions); *State v. Dahl*, 139 Wn.2d 678, 679, 990 P.2d 396 (1999) (revocation of a special sex offender sentencing alternative (SSOSA) sentence). Like parole, sentencing modification, and SSOSA revocation, the trial court's revocation of an insanity acquittee's conditional release implicates a conditional liberty dependent on the observance of special terms and conditions. *See Morrissey*, 408 U.S. at 480. Indeed, the insanity acquittee conditional release scheme embraces "the notion that the [acquittee] is entitled to retain his liberty as long as he substantially abides by

15

[its] conditions," *id.* at 479, and is not a danger to others. Therefore, as we have done in the SSOSA and sentencing modification context, we apply *Morrissey's* limited rights to confrontation and cross-examination in the context of revoking the conditional release of a person acquitted on the grounds of insanity.[1]

Under limited due process analysis, we have held that "hearsay evidence should be considered only if there is good cause to forgo live testimony." *Dahl*, 139 Wn.2d at 686. "Good cause is defined in terms of 'difficulty and expense of procuring witnesses in combination with demonstrably reliable or clearly reliable evidence.'" *Id.* (internal quotation marks omitted) (quoting *State v. Nelson*, 103 Wn.2d 760, 765, 697 P.2d 579 (1985)).

During the revocation hearing, the trial court permitted Eric King, Dang's Harborview caseworker, and Randall Vandzandt, Dang's DOC Community Corrections Officer, to testify about statements made by Harborview Medical Center's county designated mental health providers regarding Dang's desire to blow up a gas station. Acknowledging that these statements were hearsay, the court ruled that the statements were admissible because of the relaxed evidentiary standard in revocation proceedings. *See* RP at 32-33, 44, 50. However, the trial court did not engage in a good cause analysis of the difficulty and expense of procuring live witnesses or of the reliability of the evidence. This was error.

Despite this error, the Court of Appeals concluded,

> The trial court's allowance of hearsay at the hearing is not the same as the admission of reports, affidavits, and documentary evidence in lieu

---

[1] We note that the parties agree that the limited due process rights outlined in *Morrissey*, *Abd-Rahmaan*, and *Dahl* should apply in this context.

of live testimony. Thus, the requirement of good cause for the admissibility of reports, affidavits, and documentary evidence in lieu of testimony outlined in *Dahl* and *Abd-Rahmaan* is not applicable here.

*Bao Dinh Dang*, 168 Wn. App. at 487 (footnotes omitted). Neither *Abd-Rahmaan* nor *Dahl* draws a distinction between hearsay in documentary evidence and hearsay in live testimony. Nor does the Court of Appeals provide any authority for such a proposition. We reject the Court of Appeals' unsupported distinction and hold that trial courts must articulate a good faith basis for introducing hearsay evidence—whether written or spoken—in a revocation hearing of this nature.

### B. The trial court's failure to make a good cause finding was harmless error beyond a reasonable doubt

Although the trial court erred in admitting hearsay without good cause, "[v]iolations of a defendant's minimal due process right to confrontation are subject to harmless error analysis." *Dahl*, 139 Wn.2d at 688; *see also State v. Powell*, 126 Wn.2d 244, 267, 893 P.2d 615 (1995). Because sufficient nonhearsay evidence in the record supported a finding that Dang was dangerous, we hold that the trial court's error was harmless.

Dang's Harborview Medical Center case manager, Eric King, testified regarding several problems he observed after Dang returned from his trip to Vietnam in 2008. Specifically, he discussed Dang's paranoid delusions that Dang's mother was involved in the court system and the DOC, plotting to restrict his freedom. King also characterized Dang as demonstrating significant anger and opposition toward his mother. King's testimony established that Dang showed signs of mental instability.

Similarly, Randall Vanzandt, a CCO with the DOC Special Needs Unit, testified that Dang appeared uncharacteristically depressed and quiet after returning from his month-long trip to Vietnam. He also testified that Dang was suffering from paranoid delusions regarding his mother's perceived control over him. Vanzandt also recounted a particular event in which Dang expressed what Vanzandt perceived to be a threat of potential harm to himself or others:

> He said that he was going to do something big. He didn't describe what that was, but he said very clearly he was going to do something big. He said he needed to go back to Western State Hospital. Again, in my attempt to try to keep him in the community, I tried to get him to talk – to talk him down from doing something big, and I was unable to do so. He maintained that he was going to do something big, wouldn't say what it was. And at that point I felt clearly like I needed to take some action at this point. This has been, you know, a week now that I've seen some extremes in his affect and in his mood and I've seen some concerning things with regard to his thought processes and I was feeling like at that point I was needing to do something. He was again saying he was going to do something big.
>
> I tried contacting Western State Hospital just to talk with them, left a message, and at that point I just decided I was going to take him up to Harborview. I was going to try to take him to a place where he could be safe and everybody could be safe while I figured out what I was going to do about this.

RP at 48-49. The testimony of Vanzandt, a CCO trained and experienced in assessing mental health issues, that he was concerned about Dang's safety and the safety of others following Dang's statement that he was going to "do something big" probably alone supports the trial court's finding of dangerousness.

In addition to the testimony of King and Vanzandt, Dr. Norma Martin, a forensic psychologist at Western State Hospital, also testified. Dr. Martin explained that during an incident in December 2009, Dang said that he wanted to hurt himself

18

and requested isolation from others. Dr. Martin opined that this was "a severe warning sign in his mental illness and on his relapse prevention plan." RP at 68. Dr. Martin also stated that Dang "need[ed] to be in the hospital and continue to be involved in the treatment that's available for him," *id.* at 77, in order "to reduce his risk more by having more mood stability over a period of time," *id.* at 78. In addition, Dr. Martin responded affirmatively to counsel's question whether Dang needed to share his feelings more openly in order to return to the community safely, noting that Dang "remains a risk" if he does not work through his feelings. *Id.* at 92.

During Dang's testimony at the revocation hearing, Dang testified that he could have told others that he wanted to blow up a gas station:

Q. Okay. Did you ever tell anybody before you went to Western State Hospital that you were thinking about blowing up a gas station?

A. I cannot remember saying that. I don't think I said things like that at all.

Q. And if somebody else thinks that you did, do you think you might have?

A. It could be.

*Id.* at 105. Dang's admission that he might have told others that he wanted to blow up a gas station is additional untainted evidence that supports the trial court's dangerousness finding.

In addition to the testimony outlined above, the trial court also had several reports from Western State Hospital recommending against Dang's conditional release because of dangerousness and risk of criminal behavior. In making its determination on conditional release, the trial court "shall be aided by the periodic

reports filed" by medical professionals tasked with examining insanity acquittees. RCW 10.77.180; *see also State v. Thompson*, 28 Wn. App. 728, 730, 626 P.2d 51 (1981) (holding that trial court properly considered reports submitted prior to hearing on revocation of conditional release). Three such reports spanning from July 2009 to April 2010 appear in the record. The July 2009 report describes Dang's behavior as "erratic and sometimes threatening." CP at 68. The December 2009 and April 2010 reports provided a lengthy list of several of Dang's mental health problems, which included Dang's "substantial lack of insight into the harm that his crime could have produced." *Id.* at 49, 64. All of the reports conclude with the statement, "At this time, Mr. Dang has not yet adequately addressed his factors of risk and remains at *substantial risk for future violent re-offending and criminal behavior* if released to a less restrictive setting." *Id.* at 49, 64, 69 (emphasis added). Thus, the reports of mental health providers at Western State Hospital also support the trial court's conclusion that Dang's mental health issues rendered him too dangerous for conditional release.

Because various testimony and reports indicated that Dang was at risk for dangerous or criminal behavior, the trial court had ample untainted evidence before it to make a finding that Dang was dangerous.[2] Accordingly, we hold that although the trial court's admission of hearsay without a good cause finding was error, this error was harmless beyond a reasonable doubt.

---

[2] Dang contends that there was insufficient evidence in the record to support a finding that he was dangerous. Because we conclude that the trial court's error in admitting hearsay evidence was harmless due to the quantity and quality of untainted evidence the trial court relied on, we decline to separately address Dang's sufficiency of the evidence argument.

## CONCLUSION

We affirm the Court of Appeals but on different grounds. To involuntarily confine an insanity acquittee, due process requires that a court determine that he or she is dangerous. The Court of Appeals' holding to the contrary was incorrect. Nonetheless, because the trial court did find Dang dangerous, we hold that the trial court properly revoked his conditional release. We also hold that a preponderance of the evidence is the appropriate standard of proof at a hearing to revoke conditional release. Finally, we hold that the trial court erred in admitting hearsay evidence without engaging in a good cause analysis of the difficulty and expense of procuring live witnesses and the reliability of the evidence. However, because sufficient nonhearsay evidence supported the trial court's dangerousness finding, we hold that the trial court's error was harmless beyond a reasonable doubt.

Wiggins, J.

WE CONCUR.

Madsen, C.J.

González, J.

Fairhurst, J.

Stephens, J.

González, J.

Gordon McCloud, J.