FILED
COURT OF APPEALS
DIVISION II

2014 JUL 15 AM 10: 41

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44314-7-II |
| Appellant, | |
| v. | |
| MARGIE LEE DERENOFF, | PART PUBLISHED OPINION |
| Respondent. | |

LEE, J. — In 2010, a jury found Margie Lee Derenoff not guilty of third degree assault by reason of insanity, and the trial court ordered that she be conditionally released. In 2012, the trial court revoked Derenoff's conditional release because she was noncompliant with her conditions of release and presented a threat to public safety. Derenoff appeals the trial court's order revoking her conditional release, arguing that (1) she had a right to be restored to competency before attending revocation proceedings, and (2) the trial court erred in relying on hearsay evidence during the revocation proceedings. We affirm the revocation order.

## FACTS

In 2009, the State charged Derenoff with third degree assault. Derenoff was restored to competency prior to her trial, and a jury later found her not guilty of the assault by reason of insanity. The jury also found, by special verdict, that Derenoff posed a substantial danger to

others without continued judicial oversight but that it was not in Derenoff's or the public's best interest to have her detained in a state mental hospital.

Following Derenoff's trial, the trial court ordered her conditional release from Western State Hospital under a RCW 10.77.110(1) least restrictive alternative (LRA) disposition. As conditions of her release, the court ordered Derenoff to (1) submit to periodic monitoring by the Department of Corrections (DOC) staff for five years; (2) attend the Clallam County Superior Court Mental Health docket twice a month; (3) follow treatment plans, therapy sessions, and activities scheduled by her mental health providers; and (4) keep her mental illness "in the current state of remission [with] no significant signs of decompensation which affect her ability to comply with her conditional release" from Western State Hospital. Br. of Resp't, App. C.

For approximately two years, Derenoff substantially complied with the terms of her LRA disposition. However, in September 2012, Derenoff twice failed to report to the DOC and, on three occasions, refused to cooperate with her mental health providers. Gerald Brown, the DOC agent supervising Derenoff's release, recommended that the State detain Derenoff so that a RCW 10.77.190 revocation or modification hearing could be "scheduled with as much expediency as is possible so that [Derenoff] can be placed in the care of a mental health facility for evaluation and stabilization." Clerk's Papers (CP) at 68.

Police subsequently detained Derenoff and, at her counsel's request, the trial court ordered Derenoff committed to Western State Hospital for a psychological evaluation under RCW 10.77.060(1)(a) with directions:

> to determine whether [Derenoff] is competent or responsible to proceed with the revocation of the least restrictive alternative, whether the defendant is or was insane or suffering from diminished capacity, and for a recommendation

2

regarding revocation of the least restrictive alternative or disposition if the least restrictive alternative is revoked.

CP at 51. The State opposed this request, believing "RCW 10.77.060 competency evaluations are not applicable in proceedings to revoke an insanity acquittee's conditional release." CP at 30.

The State later moved to modify the court's competency evaluation order because "the doctors at Western State Hospital had consulted with the [Attorney General] and they don't think they have the authority to do a competency evaluation" on an insanity acquittee (as opposed to someone involved in criminal proceedings). Report of Proceedings (RP) (Nov. 2, 2012) at 25. The trial court agreed and modified the temporary commitment order to reflect that Derenoff should be evaluated solely to determine whether revocation of her LRA disposition was warranted on the grounds that Derenoff presented a danger to herself or the public. In addition, over Derenoff's counsel's objections, the trial court ruled that Derenoff need not be competent for her LRA revocation proceeding to move forward.

In December 2012, the court held Derenoff's LRA revocation hearing. Brown testified to Derenoff's violations of her LRA disposition terms. Additionally, the State moved to admit Western State Hospital's evaluation of Derenoff into evidence in lieu of live testimony. The evaluation recommended that Derenoff's LRA disposition be revoked because she is an imminent risk of danger to others and is not able to provide for her own basic needs of health and safety.

Derenoff objected to the admission of the Western State evaluation on hearsay grounds. Derenoff also objected to the proceeding with the revocation hearing because it was "completely

obvious" that Derenoff was not competent to understand the proceeding or assist counsel. RP (Dec. 19, 2012) at 95. The trial court ruled that the evaluation had indicia of reliability, that it would be cost prohibitive to obtain live testimony under the circumstances, and that delaying the hearing would result in Derenoff languishing in a correctional facility.

After hearing argument from both parties, the trial court revoked Derenoff's LRA disposition, entered findings and conclusions, and ordered Derenoff committed to Western State Hospital. Derenoff appeals the revocation of her LRA disposition.

## ANALYSIS

### COMPETENCY

Derenoff argues that chapter 10.77 RCW mandates that a person acquitted of a crime by reason of insanity be competent before the court may revoke his or her LRA disposition. Alternatively, she argues that due process concerns "forbid the revocation of conditions of release of a person lacking a rational and factual understanding of the proceedings and sufficient ability to consult with her lawyer and assist in preparing her defense." Br. of Appellant at 8. We disagree because nothing in chapter 10.77 RCW requires a defendant to be competent during a revocation proceeding and because sufficient due process protections exist to prevent erroneous deprivation of an insanity acquittee's liberty.

### A. STATUTORY SCHEME

We review questions of statutory interpretation de novo. *State v. Bao Dinh Dang*, 178 Wn.2d 868, 874, 312 P.3d 30 (2013). "The purpose of statutory interpretation is to determine and carry out the intent of the legislature." *State v. Sweat*, 180 Wn.2d 156, 159, 322 P.3d 1213 (2014). "Statutory interpretation begins with the statute's plain meaning." *Lake v. Woodcreek*

*Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). We evaluate the plain meaning of the statute "from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009). "'Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.'" *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003) (internal quotation marks omitted) (quoting *Davis v. Dep't of Licensing*, 137 Wn.2d 957, 963, 977 P.2d 554 (1999)). We "cannot add words or clauses to an unambiguous statute when the legislature has chosen not to include that language." *State v. Delgado*, 148 Wn.2d 723, 727, 63 P.3d 792 (2003). Moreover, "[s]tatutes are to be read together, whenever possible, to achieve a 'harmonious total statutory scheme . . . which maintains the integrity of the respective statutes.'" *State ex rel. Peninsula Neighborhood Ass'n v. Wash. Dep't of Transp.*, 142 Wn.2d 328, 342, 12 P.3d 134 (2000) (quoting *Employco Pers. Servs., Inc. v. City of Seattle*, 117 Wn.2d 606, 614, 817 P.2d 1373 (1991)).

Here, RCW 10.77.050 states that "[n]o incompetent person shall be tried, convicted, or sentenced for the commission of an offense" while incompetent. However, an LRA revocation hearing is not a trial for the commission of an offense; rather, it is a civil proceeding occurring *after* a defendant has been acquitted by reason of insanity at the end of a criminal trial. Accordingly, RCW 10.77.050 is inapplicable to LRA revocation hearings.

RCW 10.77.190 governs LRA revocation hearings. Under RCW 10.77.190(4), a revocation hearing is held to determine "whether the conditionally released person did or did not

adhere to the terms and conditions of his or her release, or whether the person presents a threat to public safety." Nothing in the statute requires the insanity acquittee to be competent.

Moreover, RCW 10.77.020(1) envisions the possibility that certain proceedings, like LRA revocation hearings, may involve a person who is not competent but is represented by counsel:

> At any and all stages of the proceedings pursuant to this chapter, any person subject to the provisions of this chapter shall be entitled to the assistance of counsel . . . . A person may waive his or her right to counsel; but such waiver shall only be effective if a court makes a specific finding that he or she is or was competent to so waive.

RCW 10.77.020(1)'s discussion of competency in specific circumstances would be superfluous if competency were required in *every* proceeding under chapter 10.77 RCW.

Applying principles of statutory construction, we observe that the legislature expressly requires competency in certain circumstances, such as criminal proceedings, RCW 10.77.050, and waiver of counsel, RCW 10.77.020(1). Yet the legislature does not require competency for other circumstances, such as hearings to revoke RCW 10.77.110(1) LRA conditional releases. We decline Derenoff's request to read in a competency requirement where the legislature has chosen to omit such language. We hold, therefore, that chapter 10.77 RCW does not require that a defendant be restored to competency before or during his or her LRA revocation hearing. Derenoff's statutory challenge fails.

B. DUE PROCESS

Derenoff next argues that, as in criminal proceedings, an insanity acquittee must be restored to competency for an LRA revocation hearing because "[r]evocation of an incompetent person's liberty is . . . de facto unfair" and violates her right to procedural due process. Br. of

6

Appellant at 8. We hold that an insanity acquittee's due process rights are sufficiently protected under chapter 10.77 RCW by other safeguards, such as assistance of counsel, when he or she is incompetent during LRA revocation proceedings.

We review questions of law, including constitutional due process guarantees, de novo. *In re Det. of Fair*, 167 Wn.2d 357, 362, 219 P.3d 89 (2009). "[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979); *see also In re Det. of Harris*, 98 Wn.2d 276, 279, 654 P.2d 109 (1982) ("[D]ue process guaranties must accompany involuntary commitment for mental disorders.").

Procedural due process prohibits the State from depriving an individual of protected liberty interests without appropriate procedural safeguards. *In re Pers. Restraint of Bush*, 164 Wn.2d 697, 704, 193 P.3d 103 (2008). Procedural due process "[a]t its core is a right to be meaningfully heard, but its minimum requirements depend on what is fair in a particular context." *In re Det. of Stout*, 159 Wn.2d 357, 370, 150 P.3d 86 (2007) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). To determine what procedural due process requires in a particular context, appellate courts employ the *Mathews* test, balancing three factors:

> (1) the private interest affected, (2) the risk of erroneous deprivation of that interest through existing procedures and the probable value, if any, of additional procedural safeguards, and (3) the governmental interest, including costs and administrative burdens of additional procedures.

*Stout*, 159 Wn.2d at 370 (citing *Mathews*, 424 U.S. at 335). Whether an insanity acquittee must be competent at his or her LRA revocation proceedings to satisfy procedural due process requirements is a matter of first impression.

Here, the first *Mathews* factor, regarding Derenoff's private interests, clearly weighs in Derenoff's favor because forced hospitalization deprives her of significant liberty interests. *Addington*, 441 U.S. at 425. The State does not contest this.

As for the second Mathews factor, existing procedures sufficiently safeguard against the erroneous deprivation of Derenoff's liberty interests. RCW 10.77.020(1) provides that all insanity acquittees subject to LRA revocation are entitled to counsel. Derenoff's rights were vigorously represented by counsel throughout the LRA proceedings here. Also, insanity acquittees are entitled to an immediate mental examination before the revocation hearing. RCW 10.77.190(2). This assures that the trial court has expert information concerning the insanity acquittee's mental health before deciding whether to modify or revoke an LRA disposition. Derenoff received such an examination before her revocation hearing.

And, revoking Derenoff's LRA disposition does not result in her indefinite civil commitment. Instead, under the statutory scheme, the State may not hold an insanity acquittee in a state mental health facility for longer than the maximum possible penal sentence for the crime charged.[1] RCW 10.77.025. Thus, the LRA revocation entitles the State to place Derenoff in a mental health facility for no longer than the remainder of her maximum possible penal sentence (five years). Even then, persons committed to a mental health facility after an LRA revocation

---

[1] At the conclusion of this period, the State may seek to have an insanity acquittee involuntarily committed to a state mental health facility under chapter 71.05 RCW. This procedure, in turn, involves further due process protections.

must be examined by mental health professionals at least once every six months. RCW 10.77.140. Following such examination, the secretary of the Department of Social and Health Services (or his or her designee) or the examinee, may request conditional release and restoration of his or her LRA disposition. RCW 10.77.150. Furthermore, an insanity acquittee may request conditional release every six months. RCW 10.77.150(5).

Thus, although risk of an erroneous deprivation of liberty is a real concern, the procedures currently in place under chapter 10.77 RCW provide significant procedural safeguards for insanity acquittees facing LRA revocations. Derenoff has failed to explain how being restored to competency would decrease the likelihood of an erroneous deprivation of her liberty interests or why the procedural safeguards in place under chapter 10.77 RCW are insufficient to satisfy due process under the second *Mathews* factor.

The third *Mathews* factor—the governmental interest, including costs and administrative burdens of additional procedures—weighs heavily in favor of the State. The State has a strong interest in detaining "mentally unstable individuals who present a danger to the public." *United States v. Salerno*, 481 U.S. 739, 748-49, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). And, the LRA revocation/modification proceeding under RCW 10.77.190 is designed to efficiently determine whether an insanity acquittee has violated the conditions of her release and presents a danger to herself or others. Requiring that an insanity acquittee be restored to competency *before* revocation proceedings would nullify any efficiencies without any increase in procedural safeguard benefits. Finally, under the current statutory scheme, trial courts have discretion to modify an insanity acquittee's conditional release. RCW 10.77.190(4). Accordingly, if the trial court considers it in the best interests of the insanity acquittee and the public to restore an

9

insanity acquittee to competency so that she can resume her LRA disposition, the trial court may order such restoration as a modification of the LRA disposition. Maintaining the trial court's discretion to efficiently address and modify conditions of an acquittee's release is a significant governmental interest.

On balance, the *Mathews* factors weigh against requiring that an insanity acquittee be restored to competency before his or her LRA revocation/modification hearing. Chapter 10.77 RCW provides numerous and sufficient procedural due process protections and, under the statutory scheme, there is little risk that an insanity acquittee would erroneously be deprived of significant liberty interests. We affirm the trial court's revocation of Derenoff's LRA.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

REPORT IN LIEU OF LIVE TESTIMONY

Derenoff next argues that the trial court violated her due process rights to confront witnesses when it relied exclusively on Dr. Hendrickson's evaluation from Western State Hospital in revoking her LRA disposition. Because the trial court established good cause for relying on the Western State Hospital evaluation in lieu of live testimony, the trial court did not err by admitting the evaluation.

We review questions of law, including constitutional due process guarantees, de novo. *In re Fair*, 167 Wn.2d at 362. "When confronted with revocation of a qualified or conditional liberty, the United States Supreme Court has indicated that limited Fourteenth Amendment due process guaranties apply." *Dang*, 178 Wn.2d at 883. "These rights include the right to confront

10

and cross-examine witnesses unless there is articulable good cause for disallowing confrontation." *Dang*, 178 Wn.2d at 883.

"Like parole, sentencing modification, and SSOSA [special sex offender sentencing alternative] revocation, the trial court's revocation of an insanity acquittee's conditional release implicates a conditional liberty dependent on the observance of special terms and conditions." *Dang*, 178 Wn.2d at 883. Thus, "hearsay evidence should be considered only if there is good cause to forgo live testimony." *State v. Dahl*, 139 Wn.2d 678, 686, 990 P.2d 396 (1999). "Good cause is defined in terms of 'difficulty and expense of procuring witnesses in combination with demonstrably reliable or clearly reliable evidence.'" *Dahl*, 139 Wn.2d at 686 (internal quotations omitted) (quoting *State v. Nelson*, 103 Wn.2d 760, 764-65, 697 P.2d 579 (1985)).

For instance, in *Dahl*, the trial court relied on hearsay evidence in a SSOSA revocation hearing that was "neither demonstrably reliable nor necessary, due to the difficulty in procuring live witnesses." 139 Wn.2d at 687. Because the defendant's SSOSA "revocation appear[ed] to have been based, at least in part, on consideration of the [hearsay]," the Supreme Court held that the trial court's failure to establish a good cause basis for relying on the hearsay was not harmless and remanded for a new hearing. *Dahl*, 139 Wn.2d at 689. Similarly, in *State v. Abd-Rahmaan*, 154 Wn.2d 280, 290-91, 111 P.3d 1157 (2005), the Supreme Court held that a trial court's sentence modification was invalid because it relied on hearsay evidence during the modification proceeding without establishing good cause.

Here, unlike in *Dahl* and *Abd-Rahmaan*, the trial court did articulate good cause for relying on the Western State Hospital evaluation in lieu of live testimony. In its oral ruling on whether to admit the evaluation, the trial court stated:

I do find there is good cause to admit that [evaluation] in lieu of live testimony for a number of reasons. Number 1, the Court is very, very familiar with the staff, the processes, the [evaluations] generated by Western State [H]ospital [and] we rely on them on almost a daily basis, uh, without the benefit of live testimony. There [are] certainly indicia of reliability in these [evaluations]. As I indicated, the Court has come to rely upon the opinions of the experts at Western State Hospital in precisely these kinds of situations.

[Second], it is very, very expensive and logistically challenging to get Dr. Hendrickson or one of his colleagues to get [here] and provide live testimony. I think it's safe to assume that were that to happen, what we'd get is a verbal recitation of what is written in the [evaluation] and get the same recommendations. Yes, it would be subject to cross[-]examination but that would be of minimal benefit to the Court in these circumstances.

Finally, it would consume a great deal more time which means Ms. Derenoff remains in jail and that is not something I want to see happen. If I were to keep the [evaluation] out at this point now . . . she would continue to languish in a correction facility rather than a treatment facility.

I think it is to her benefit to have this hearing this morning and get on with this and, uh, for those reasons I will admit the [evaluations] as a substantive evidence at this hearing.

RP (Dec. 19, 2012) at 76-77.

The trial court's oral ruling set forth good cause: (1) it articulated the cost prohibitive nature of requiring live testimony under the circumstances of the case, (2) it explained the reliability of the Western State evaluation, (3) it acknowledged the logistical challenges securing live testimony in this case posed, and (4) it recognized that the delay necessary to secure live testimony would cause Derenoff to languish in a correctional facility. Thus, the trial court did not err in admitting and relying on the evaluation in lieu of live testimony.

No. 44314-7-II

We affirm the revocation order.

_____
Lee, J.

We concur:

_____
Hunt, J.

_____
Bjorgen, A.C.J.

13