# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>C.C.,<br><br>                Appellant. | No. 57176-5-II<br><br><br>UNPUBLISHED OPINION |

CRUSER, A.C.J. – CC appeals the superior court's 180-day commitment order for involuntary treatment under the "Involuntary Treatment Act" (ITA), chapter 71.05 RCW.[1] CC argues that the superior court erred when it concluded that she continues to present a substantial likelihood of repeating acts similar to the charged criminal behavior because the evidence presented was not recent and "was largely hearsay." Br. of Appellant at 12. We affirm.

FACTS

I.      BACKGROUND

On August 10, 2018, CC met with her former boyfriend in violation of a no contact order (NCO) prohibiting her from contacting him. During this meeting, CC punched her former boyfriend in the face and struck him with her car.

---

[1] Because an involuntary commitment order may have adverse consequences on future involuntary commitment determinations, this appeal is not moot even though CC's commitment period under the challenged order has expired. *In re Det. of M.K.*, 168 Wn. App. 621, 625-30, 279 P.3d 897 (2012).

The State charged CC with first degree assault and assault in violation of a protective order. CC later assaulted two corrections officers while in jail, and the State added two counts of third degree assault.

CC was determined to be incompetent, and the criminal charges were dismissed. On October 5, 2018, a superior court commissioner committed CC to 180 days of involuntary treatment after finding that CC, as the result of a mental disorder, presented "a substantial likelihood of repeating acts similar to the charge criminal behavior" and was "gravely disabled." Clerk's Papers (CP) at 136.

## II.    PETITION TO EXTEND INVOLUNTARY TREATMENT

On April 1, 2022, examining physician Rosa Epistola, MD, and examining mental health professional Rosario Archer, PhD, petitioned to for an additional 180 days of involuntary treatment under RCW 71.05.280(3). They asserted that CC continued to present a substantial likelihood of repeating acts similar to the charged behavior. In a supporting declaration, Dr. Epistola and Archer, provided the facts to support the petition.

The declarants stated that CC had a significant mental health history consisting of more than "270 contacts with the mental health system . . . since 2005" and several hospitalizations for mental health concerns. *Id.* at 5. CC's admission to Western State Hospital (WSH) at that time was her third.

Her first civil commitment was from October 9, 2017 to October 13, 2017, following an assault of her former boyfriend and a violation of an NCO. Her second commitment was from January through June 2018, following another violation of the NCO. During these commitments, CC was diagnosed with "Delusional Disorder," "Bipolar Disorder," and "Autism Spectrum

2

Disorder." *Id.* at 6. She was released from the 2018 commitment on conditional release on June 5, 2018, just two months before the August 10 incident.

Regarding the commitment period at issue here, the declarants stated CC had not violated the still-existing NCO with the victim. But they further stated that CC's "behavioral functioning" had not significantly changed, that she was dismissive of boundaries when enforced, and that she continued to engage in "defiant behavior" and to have difficulty complying with various phone and ward protocols. *Id.* at 7, 11. They noted that CC frequently displayed irrational emotional responses when stressed, told no, or believed her rights were violated. And she justified her attempts to violate any phone restrictions by asserting that it was her right to make phone calls to anyone she chose. The declarants concluded that these behaviors demonstrated that CC's judgment was still "markedly impaired," and that her oppositional and defiant behaviors were likely a manifestation of her behavior health disorders. *Id.* at 11.

The declarants also stated that, based on "clinical chart documentation," CC continued to resist meaningful participation in treatment, she did not believe she had a mental health disorder, and she continued to claim that there was no evidence that she had actually struck the victim with her vehicle and she was just " 'trying to teach him a lesson.' " *Id.* at 7-8 (italics omitted). They further stated that although CC had not engaged in any "significant assaultive behavior since 04/05/2019," CC continued to engage in other behaviors that were "provocative, criminal and defiant" as the result of non-conscious impulsive, reflexive, or compulsive efforts to deal with underlying anxiety. *Id.* at 12.

Additionally, the declarants stated that on March 23, 2022, CC's social worker noted that CC "reported she feels the NCO holder has to pay in some way for her staying at WSH and that

she is 'likely' to contact him upon her discharge from WSH." *Id.* at 7 (italics omitted). The declarants found this comment particularly concerning. And when they asked CC during the mental status examination about whether she intended to comply with the NCO if she was released, CC had refused to respond.

The declarants summarized,

During the last 180 days [CC] has demonstrated some evidence of reckless disregard for the safety of herself and others. She has continually stated that her phone calls have nothing to do with safety, including ward safety and the safety of the alleged victim of her index offense. Despite this assertion she has demonstrated greater compliance with them, evidencing some positive aspects of her current treatment regime on insight. [CC] has demonstrated a lack of remorse, as indicated by her indifference to causing others harm and continual rationalizing of her behaviors. As she discussed, he[r] primary goal in initiating phone calls or contact to the victim of the alleged index offense was to achieve fairness and justice[,] "I wanted to teach him a lesson" (her answer when asked to detail her index offense.) . . . . [CC] has shared with treatment providers that her intention is to share her feelings towards the protected party as she believes he should bear some accountability for her commitment.

*Id.* at 14-15 (internal citation omitted). The declarants also emphasized that although CC had not contacted the victim during this review period, "[a]ccording to medical records[,] [CC] has stated that she inten[ds] to contact [the victim] upon release and is concerned that this may 'blow up' if she [is] not allowed to contact him prior to her release." *Id.* at 15.

The declarants further stated,

It is [hypothesized] that her desire to be heard and validated by the protected party and for him to "acknowledge what he's done" continues to enhance her desire to reach out to him (including indirectly) since she believes he no longer listens to her voice messages. In addition, she also believes that he will change his mind since [CC] reports he has set limits historically but not been consistent [in] maintain[ing] those limits. Despite holding these beliefs, [CC] has demonstrated that with specific rules and staff preventing her she can adhere to the NCO and has not reached out to him as documented in [her] chart over this review period.

It is the view of the undersigned that given her previously documented attempts to contact the victim, there is a high likelihood this would occur if release[d] directly to the community without any supportive structure in place. [CC] has expressed a desire and motivation to participate in therapy in a less restrictive alternative [(LRA)] to address her feelings toward the protected party and to process her admission to [WSH].

*Id.* at 15-16.

### III. HEARING AND COMMITMENT ORDER

On June 14, 2022, a pro tem commissioner considered the petition. After permitting CC to read a statement, the commissioner considered the petition and supporting declaration. CC did not attempt to rebut the petition and declaration with her own expert's opinion. The court granted the petition.

Three days later, a second commissioner filed an amended order granting the petition and finding that "as a result of a behavioral health disorder [CC] continues to present a substantial likelihood of repeated acts similar to the charged criminal behavior." [2] *Id.* at 44. For the facts in support of the petition, the commissioner "adopt[ed] by reference findings as stated by experts in declaration in support thereof."[3] *Id.*

CC moved for revision of the commissioner's decision. The superior court concluded that the commissioner's decision was supported by the evidence, denied the motion for revision, and "adhere[d] the ruling of the commissioners." Verbatim Report of Proceedings (July 15, 2022) at 16.

---

[2] The original order issued by the first commissioner contained errors, and the parties agreed to an amended order that was then entered by a different commissioner.

[3] The commissioner also found that an LRA was in CC's best interest. The parties do not challenge that finding.

CC appeals.

## ANALYSIS

CC argues that the superior court erred by concluding that she continues to present a substantial likelihood of repeating acts similar to the charged criminal behavior because the evidence in the supporting declaration either related to behaviors that were two to four years old or was hearsay. We disagree.

### I.    LEGAL PRINCIPLES

When the superior court decides a motion to revise an order granting a petition for involuntary treatment, we review de novo the superior court's decision, not the court commissioner's decision. *In re Det. of L.K.*, 14 Wn. App. 2d 542, 550, 471 P.3d 975 (2020). We review the superior court's decision " 'based on the evidence and issues presented to the commissioner.' " *Id.* (quoting *In re Vulnerable Adult Pet. for Winter*, 12 Wn. App. 2d 815, 829, 460 P.3d 667 (2020)). The court commissioner's findings and orders, if not successfully revised, become the orders and findings of the superior court. *Id.*

### II.    RCW 71.05.320(4)(c) SPECIAL PROCEDURE

Because the commitment proceeding at issue here differs from other commitment proceedings, a brief summary of the procedures that apply to this petition is helpful.

RCW 71.05.280(3) provides that a person may be committed for involuntary treatment when that person has been determined to be incompetent; the criminal charges have been dismissed; and the person "has committed acts constituting a felony, and as a result of a behavioral health disorder, presents a substantial likelihood of repeating similar acts." After the initial

commitment under RCW 71.05.280(3) expires, a party can file a petition to extend the commitment

for an additional 180-day period under RCW 71.05.320(4)(c).

> RCW 71.05.320(4) provides:

> The person shall be released from involuntary treatment at the expiration of the period of commitment . . . unless the superintendent or professional person in charge of the facility in which he or she is confined, or in the event of a less restrictive alternative, the designated crisis responder, files a new petition for involuntary treatment on the grounds that the committed person:
> . . . .
> (c)(i) Is in custody pursuant to RCW 71.05.280(3) and as a result of a behavioral health disorder or developmental disability continues to present a substantial likelihood of repeating acts similar to the charged criminal behavior, when considering the person's life history, progress in treatment, and the public safety.
> (ii) In cases under this subsection where the court has made an affirmative special finding under RCW 71.05.280(3)(b), *the commitment shall continue for up to an additional one hundred eighty-day period whenever the petition presents prima facie evidence* that the person continues to suffer from a behavioral health disorder or developmental disability that results in a substantial likelihood of committing acts similar to the charged criminal behavior, *unless the person presents proof through an admissible expert opinion that the person's condition has so changed such that the behavioral health disorder or developmental disability no longer presents a substantial likelihood of the person committing acts similar to the charged criminal behavior*.

(Emphasis added.)

RCW 71.05.320(4)(c)(ii) "provides a special procedure for petitioning for the continued

commitment of individuals incompetent to stand trial when the court has determined they

committed an act constituting a violent felony." *In re Det. of M.W.*, 185 Wn.2d 633, 643-44, 374

P.3d 1123 (2016). "Unlike other proceedings under the ITA that proceed directly to a full

evidentiary hearing upon the State's petition for recommitment, [this] process begins with a

preliminary hearing before a full evidentiary hearing is warranted." *Id.* at 644.

7

At this preliminary stage, the superior court first determines whether "the State's petition meets its initial burden." *Id.* To meet its burden, the petitioner must present "prima facie evidence" that " 'the person continues to suffer from a mental disorder or developmental disability that results in a substantial likelihood of committing acts similar to the charged criminal behavior.' " *Id.* (quoting former RCW 71.05.320(3)(c)(ii) (2013), now codified as RCW 71.05.320(4)(c)(ii)). Prima facie evidence is "evidence of sufficient circumstances which would support a logical and reasonable inference of the facts sought to be proved." *State v. Vangerpen*, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995)).

The petitioner must establish this evidence through affidavits signed by two individuals who are either physicians, physician assistants, psychiatric advanced registered nurse practitioners, or mental health professionals. *M.W.*, 185 Wn.2d at 644 (citing former RCW 71.05.290(2)(e) (2009), now codified as RCW 71.05.290(2)(a)(i)).[4] These affidavits must describe in detail the facts that justify recommitment. *M.W.*, 185 Wn.2d at 644.

If the superior court finds that the petitioner has met this burden, "then the [respondent] may rebut the [petitioner's] showing by presenting 'proof through an admissible expert opinion that the person's condition has so changed such that the mental disorder or developmental disability no longer presents a substantial likelihood of the person committing acts similar to the charged criminal behavior.' " *M.W.*, 185 Wn.2d at 644 (quoting former RCW 71.05.320(3)(c)(ii)).

---

[4] RCW 71.05.290(2)(a)(i) states that "[t]he petition shall summarize the facts which support the need for further commitment and shall be supported by affidavits based on an examination of the patient and signed by" two individuals who are either physicians, physician assistants, psychiatric advanced registered nurse practitioners, or mental health professionals.

If the respondent does not rebut the petitioner's evidence, the court "shall" grant the petition for additional involuntary treatment. RCW 71.05.320(4)(c)(ii); *see also M.W.*, 185 Wn.2d at 644. The petition will only proceed to a full evidentiary hearing if the respondent presents evidence rebutting the petitioner's evidence. *M.W.*, 185 Wn.2d at 644-45.

### III.    DISCUSSION

CC argues that the petitioners failed to present prima facie evidence establishing that she presented a substantial likelihood of repeating acts similar to the dismissed criminal acts because the evidence presented was not recent and "was largely hearsay." Br. of Appellant at 12. Given the nature of the proceedings here, we disagree.

### A.    PRIOR BEHAVIOR

The declaration presented to the superior court did describe CC's prior behavior. RCW 71.05.320(4)(c)(i) requires the court to consider "the person's life history" when determining whether to extend the commitment. And CC's prior behavior was relevant to how CC would potentially behave if she was no longer in custody, so CC does not show that the court's consideration of these facts was error.

Furthermore, nothing in the record suggests that the superior court considered CC's behavior for any improper purpose or that the court's conclusion was based solely on CC's past behavior. Instead, the court's decision, which adopted the declarants' statements, was based on (1) CC's persistent and ongoing refusal to comply with rules, (2) her continuing reactions when forced to comply with the rules, (3) her recent statements that she would contact the victim again when released and that he "should bear some accountability for her commitment," and (4) her stated concern that if she was unable to contact the victim before her release her intended communication

with him might " 'blow up.' " CP at 15. Thus, to the extent the court relied on any historical information, such reliance was appropriate.

B.      HEARSAY

Regarding CC's hearsay argument, CC does not cite any authority prohibiting the court from relying on hearsay statements in a declaration or affidavit supporting a petition brought under RCW 71.05.320(4)(c). And when " 'no authorities are cited in support of a proposition, [we are] not required to search out authorities, but may assume that counsel, after diligent search, has found none.' " *Nguyen v. City of Seattle*, 179 Wn. App. 155, 171, 317 P.3d 518 (2014) (internal quotation marks omitted) (quoting *State v. Logan*, 102 Wn. App. 907, 911 n. 1, 10 P.3d 504 (2000)).

Additionally, there is nothing in RCW 71.05.320(4)(c) or RCW 71.05.290(2)(a)(i) that requires the supporting affidavits or declarations to be based on first-hand knowledge. RCW 71.05.290(2)(a)(i) requires only that a petition summarize the facts supporting the need for continued commitment and that the petition be supported by affidavits signed by two specially qualified individuals. And limiting these individuals' statements to facts for which they have first-hand knowledge would not make sense in this context because there is no mechanism by which another witness can present their own affidavit at the first stage of proceedings under RCW 71.05.320(4)(c). *M.W.*, 185 Wn.2d at 644.

CC relies on *State v. Dang*, 178 Wn.2d 868, 879, 312 P.3d 30 (2013). But *Dang* addresses the revocation of conditional release following an adversarial hearing at which live testimony was taken. It does not address whether a court can rely on hearsay within a declaration submitted under RCW 71.05.320(4)(c)(ii) when determining whether the petitioner had met its burden of presenting prima facie evidence.

CC also argues that because the declarants did not have personal knowledge of the information they obtained from staff and treatment team members, the declarants could not declare that the information in the declaration was true and accurate and, therefore, the petitioner did not prove that CC presented a substantial likelihood of repeating similar acts. But this argument ignores the structure of the special proceedings under RCW 71.05.320(4)(c), under which the supporting declaration or affidavit is required to describe in detail the facts that justify recommitment. *M.W.*, 185 Wn.2d at 644. And an expert can consider hearsay in forming his or her opinion. *In re Det. of Mashall*, 156 Wn.2d 150, 157, 125 P.3d 111 (2005).

CC fails to establish that the superior court erred when it concluded that she continues to present a substantial likelihood of repeating acts similar to the charged criminal behavior. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

                                           CRUSER, A.C.J.

We concur:

LEE, J.

VELJACIC, J.