# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

COMMISSIONER ERIC WATNESS, as
personal representative of the estate of
Charleena Lyles; KAREN CLARK, as
guardian ad litem on behalf of the four
minor children of decedent,

Plaintiffs,

v.

THE CITY OF SEATTLE, a
municipality; JASON M. ANDERSON
and STEVEN A. MCNEW, individually

Respondents,

SOLID GROUND, a Washington
nonprofit corporation,

Defendant,

KAREN KOEHLER and EDWARD
MOORE, plaintiffs' attorneys,

Appellants.

No. 78819-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: December 30, 2019

APPELWICK, C.J. — This appeal arises from a negligence suit filed on behalf of Lyles's estate. On June 18, 2018, Lyles was shot by two SPD officers and died as a result of her injuries. Koehler and Moore, counsel for Lyles's estate, filed a motion under RCW 9.72.090, alleging that one of the officers had committed perjury during a deposition. The motion requested that the trial court refer the matter to the appropriate prosecuting attorney's office. In response, the

respondents moved for CR 11 sanctions against Koehler and Moore, alleging that the motion was not well grounded in fact or existing law, and lacked good faith arguments. The trial court granted the respondents' motion and imposed CR 11 sanctions. Koehler and Moore raise several issues on appeal, arguing in part that the trial court deprived them of due process, erred in excluding its expert witness, abused its discretion in imposing sanctions, and violated their First Amendment rights. We affirm the imposition of sanctions, but reverse as to the trial court's evidentiary ruling excluding the expert.

## FACTS

On June 18, 2017, Charleena Lyles called 911 to report a burglary. In response, Seattle Police Department (SPD) officers Jason Anderson and Steven McNew were dispatched to her home. After Anderson and McNew arrived, the situation quickly escalated, and they shot Lyles seven times. SPD's Force Investigation Team (FIT) was then dispatched to the scene. Lyles died as a result of her injuries.

During the incident, Anderson and McNew used in-car video (ICV) systems that made an audio recording of their actions. Later that day, SPD obtained surveillance video of the shooting from the Solid Ground Housing complex, which maintained and controlled the video system outside Lyles's apartment. SPD video specialists then redacted and recoded the audio and video for public release.

FIT publicly released the video on June 19, 2017. The SPD media relations unit uploaded the video to YouTube,[1] which involved another proprietary

---

[1] "YouTube" is a social media platform for viewing and sharing videos.

2

transcoding process. King 5 News later synchronized the audio and video, matching the sound of gunshots to a visual of Anderson in the hall outside Lyles's apartment.

FIT interviewed Anderson on June 20 and 22, 2017. During the interview, Anderson described firing his weapon toward Lyles from standing in the doorway of her apartment. Before doing so, he stated that Lyles had tried to stab him, stepped back into her living room, and "proceeded to come around the . . . peninsula of the kitchen towards Officer McNew, who did not have an escape route." He also stated that the door to her apartment was closed.

On September 8, 2017, Commissioner Eric Watness, as personal representative of Lyles's estate, and Karen Clark, as guardian ad litem of her four minor children, sued Anderson and McNew for negligence and wrongful death.[2] They later added the City of Seattle and Solid Ground as defendants.

On February 2, 2018, the trial court entered a stipulated protective order regarding discovery materials. With regard to deposition testimony, paragraph 5.2(b) of the order stated,

> [T]he parties must identify on the record, during the deposition, all protected testimony, without prejudice to their right to so designate other testimony after reviewing the transcript. Any party or non-party may, within thirty (30) days after receiving a deposition transcript, designate portions of the transcript, or exhibits thereto, as confidential.

---

[2] The parties do not provide a citation to the original or amended complaints, and we were not able to locate them in the record.

It also provided that "disclosure or discovery material that qualifies for protection under this agreement must be clearly so designated before or when the material is disclosed or produced."

Karen Koehler, counsel for the plaintiffs, deposed Anderson on February 13 and April 26, 2018. During the April 26 deposition, Koehler focused her questions on whether Anderson was inside Lyles's apartment at the time of the shooting. She repeatedly asked him about his position relative to the door to Lyles's apartment and the hallway outside her apartment when the shots were fired:

> Q    Well, looking at the transcript, did you step out of the door before or after the shots were fired?
> A    After --
>
> . . . .
>
> Q    (By Ms. Koehler) So if we go to after the shots were fired, did you step out of the door before Officer McNew said, Suspect is down, we need officers on-scene.
> A    I'm sorry. I don't -- I don't know exactly at what point I stepped outside of the door other than it was after the shots were fired. I don't know if it's -- my memory is not clear of exactly what point.
> Q    How do you know that you stepped out of the door after the shots were fired?
> A    I remember opening the door, opening the door with the thought of how do we get the children out of the apartment, trying to assess how we're going to do that safely.

In describing the moments before the shooting, Anderson also stated, "I sidestepped to my left slightly to be in front of the closed door of the apartment, trying to create more distance and gain some more time to assess what was going on." Koehler stated in a declaration that, during the deposition she told Anderson

that it "looked like he was shooting in the hall," based on the surveillance video.[3]

Anderson did not change his testimony based on her observation.

After Anderson's deposition, Koehler asked her co-counsel, Edward Moore, to have the redacted ICV audio recording and hallway surveillance video synchronized by an expert. Dr. Wilson "Toby" Hayes, a biomechanical engineer, completed this synchronization on May 8, 2018. He concluded,

> 7.      It is my opinion, on a more probable than not basis, that the synchronized video is an accurate depiction of what occurred between Charleena Lyles and Officers McNew and Anderson.
> 8.      The synchronized video and audio accurately depict Officer Anderson's actions at the time the gunshots are heard. The synchronized video and audio accurately depict Officer Anderson in the open doorway and the hallway at the only time that gunshots can be heard.

Koehler received the synchronized videos on May 16, and asked her associate to locate the unredacted videos on May 17.

Based on the synchronized videos, Koehler grew concerned that Anderson had committed perjury during his deposition when he stated that he had his back to a closed door inside Lyles's apartment at the time of the shooting. She considered writing a letter to the prosecuting attorney regarding this concern:

> I wrote the letter on May 17, 2018. It was directed to the applicable public officials and requested not only that the matter be forwarded to the prosecutor, but that the FIT, [Force Review Board (FRB)], [and Crime Scene Investigation Unit (CSI)] investigations all be reopened. I then sat on the letter on advice of Mr. Moore as we were not sure if it was the correct approach to take. Most importantly, 30 days had not run regarding confidentiality of the deposition of Officer Anderson and the letter did not refer to the deposition as a result. We also wanted to make sure that all of the video issues were resolved. I communicated also on May 17, that I needed to be exactly 100%

---

[3] The referenced portion of the Anderson deposition is not in the record.

sure what was synchronized and that the letter would not be sent until I was 100% positive the officer was shooting in the hall. I had watched that video 20 times and it looked beyond doubt but I wanted to be sure. I asked Ms. Nguyen to continue to follow-up regarding the unredacted videos so those could also be synchronized.

(Footnote omitted.) She did not have the unredacted videos synchronized.

A few weeks later, Koehler decided that the best course of action would be to file a motion under RCW 9.72.090:

I re-read all of the perjury statutes. This is when I zeroed in on the language of RCW 9.72.090. I read it over and over. This statute provided a mechanism for referring the charge of perjury to the prosecutor. The difference was that it empowered the judge to do so. This made enormous sense to me. Instead of writing a letter and asking the prosecutor to find perjury, I could apply directly to the court. This felt like a better and more reasonable course of action to take.

On June 18, 2018, the one year anniversary of Lyles's death, the appellants filed a motion for a finding that Anderson committed perjury, and for transmittal to the prosecuting attorney pursuant to RCW 9.72.090. They did not request that the motion be heard with oral argument. Both Koehler and Moore signed the motion.

The plaintiffs filed the motion at 1:26 p.m. Koehler provided a copy of the motion to the media after filing. By 1:55 p.m., Alex Rozier of King 5 News tweeted a screen capture of the motion with the hashtag, "#BREAKING." The motion had not yet been served. At approximately 2:03 p.m., a paralegal at Koehler and Moore's law firm began the steps to electronically serve the motion on the defendants. That day, Koehler retweeted Rozier's post with the hashtags "#sayhername" and "#CharleenaLyles." She also retweeted several news articles regarding the case. And, she tweeted, "One year ago Charleena Lyles was shot

6

to death in her own home by the police. Today we honor her memory and children by relentlessly fighting to uncover the truth of what happened."

On June 22, 2018, in response to the plaintiffs' motion, the defendants filed a motion for CR 11 sanctions, and a motion to strike inadmissible materials. They provided notice of the motion to Koehler and Moore the day before. In the motion, they alleged that Koehler and Moore

> [v]iolate[d] CR 11 by filing a motion that is not well grounded in fact or existing law and lacks good faith arguments. Aside from its true purpose of garnering media attention for Ms. Koehler and Mr. Moore, this motion is intended to harass Defendants, needlessly increase defense costs in the subject litigation, and materially prejudice this proceeding by publicly attacking the character and credibility of a party.

They requested oral argument, but did not note the motion.

On June 25, the plaintiffs filed a reply, arguing in part that the defendants' motion violated King County Local Rule (KCLR) 7(b)(4)(A) and (5)(A), would prejudice them and their counsel, and was not noted. The plaintiffs did not request oral argument in their reply.

On June 26, 2018, the trial court denied the plaintiffs' motion and granted the defendants' motions without oral argument. The plaintiffs then filed a motion for reconsideration. Again, they did not request oral argument. They attached several declarations to their motion, including declarations from attorneys James Lobsenz and Peter Jarvis. Lobsenz and Jarvis argued in part that the defendants' assertion that the plaintiffs' motion lacked legal support was erroneous.

On July 26, 2018, the trial court entered another order granting the defendants' motions. It found that "Ms. Koehler and Mr. Moore's motion has no

7

basis in existing law or the facts of this case." And, it found that "[t]he motion lacks good faith arguments and serves no purpose other than to harass Defendants, generate media attention, inflame the public, and materially prejudice these proceedings and defendant's right to a fair trial." It stated that it had considered the declarations the plaintiffs attached to their motion for reconsideration. It also ordered Koehler and Moore to pay the defendants "reasonable fees and expenses in the amount of $24,469.68."

Koehler and Moore appeal.

## DISCUSSION

The appellants[4] make four main arguments. First, they argue that the trial court deprived them of due process by ruling on the motion for sanctions without affording them a reasonable opportunity to respond. Second, they argue that the trial court abused its discretion in granting the motion for CR 11 sanctions. In doing so, they contend that (1) certain factual findings were not supported by substantial evidence, and (2) Koehler's interactions with the media did not violate RPC 3.6. Third, they argue that Hayes's declaration satisfied ER 702 and Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). Fourth, they argue that the trial court's orders violated their First Amendment rights and prejudiced their client's right of representation.[5]

---

[4] We refer to Koehler and Moore collectively as "the appellants."

[5] The appellants also argue that they complied with the discovery rules with regard to disclosing Hayes as an expert. It is unclear if their argument is meant to refer to a conclusion drawn by the trial court, because they provide no citation to the record. In fact, their entire argument includes no citations to the record or legal authority, contrary to RAP 10.3(a)(6). As a result, we do not consider this argument.

I. Due Process

The appellants argue first that the trial court deprived them of due process by ruling on the motion for sanctions without affording them a reasonable opportunity to respond.

CR 11 procedures must comport with due process requirements. Bryant v. Joseph Tree, Inc., 119 Wn.2d 210, 224, 829 P.2d 1099 (1992). "Due process requires notice and an opportunity to be heard before a governmental deprivation of a property interest." Id. As a result, a party seeking CR 11 sanctions should "give notice to the court and the offending party promptly upon discovering a basis for doing so." Id. We review questions of law, including constitutional due process guaranties, de novo. State v. Derenoff, 182 Wn. App. 458, 465, 332 P.3d 1001 (2014).

The appellants argue that "the trial judge failed to notify Plaintiff's counsel that she was considering sanctions against them." On June 21, 2018, counsel for the respondents[6] e-mailed the appellants a copy of their sanctions motion. Koehler responded to the e-mail that same day. The respondents filed the motion for sanctions on June 22, and the appellants filed a reply on June 25. The trial court granted the motion on June 26. Accordingly, the appellants were on notice that the trial court would be considering sanctions. Although the respondents also requested oral argument, the trial court did not order oral argument before imposing sanctions. Notably, the appellants never requested oral argument.

---

[6] We refer collectively to the City of Seattle, Anderson, and McNew as "the respondents."

The respondents compare this case to Bryant. There, the State Supreme Court held that Bolin's due process rights were not violated when Rosenberg and Koch requested CR 11 sanctions in their appellants' reply brief, and cited Bolin's motion to disqualify as a basis for sanctions. Bryant, 119 Wn.2d at 224. The court noted that Rosenberg and Koch "provided Bolin with notice prior to oral argument that they were seeking CR 11 sanctions." Id. And, at oral argument, "Bolin had the opportunity to be heard on the issue." Id.

The respondents here requested CR 11 sanctions in response to the appellants' perjury motion. The basis for the respondents' sanctions request was clear. The respondents argued that the appellants' perjury motion was "not well grounded in fact or existing law and lack[ed] good faith arguments." Thus, similar to Bryant, they made their request in a responsive brief. The appellants received a copy of the motion for sanctions a day before it was filed. They responded to the motion for sanctions four days later in their reply brief. They objected to the motion on procedural grounds.

The appellants had another opportunity to be heard on the issue in their motion for reconsideration. They attached several declarations in support of the motion. The trial court considered the declarations before, again, imposing CR 11 sanctions.

The appellants contend that the respondents violated CR 7 and KCLR 7. Specifically, they argue that because the respondents did not serve the motion for sanctions at least six days before it was considered, did not note the motion, and did not file a notice to shorten time, they violated KCLR 7(b)(4)(A), 7(b)(5)(A), and

7(b)(10). Assuming without deciding that these rules apply on these facts, the appellants have not demonstrated that they were prejudiced in their ability to defend against the motion.

The trial court did not deprive the appellants of due process.[7]

II.   CR 11 Sanctions

The appellants argue second that the trial court abused its discretion in granting the respondents' request for CR 11 sanctions. They also challenge several of the trial court's findings of fact, and its conclusion that Koehler violated RPC 3.6.

We review a trial court's decision to impose or deny CR 11 sanctions for an abuse of discretion. Bldg. Indus. Ass'n of Wash. v. McCarthy, 152 Wn. App. 720, 745, 218 P.3d 196 (2009). The trial court abuses its discretion where its conclusion was the result of an exercise of discretion that was manifestly unreasonable or based on untenable grounds or reasons. Skimming v. Boxer, 119 Wn. App. 748, 754, 82 P.3d 707 (2004).

A. Substantial Evidence

The appellants argue that three of the trial court's factual findings are not supported by substantial evidence.

---

[7] The appellants note that it is "unclear whether the judge ever considered (or ruled upon) [the motion for reconsideration]." Although the second order imposing sanctions states that the trial court considered the declarations attached to the appellants' motion for reconsideration, it does not explicitly deny that motion. Still, because the court considered those declarations, we construe the order as denying the motion.

This court reviews the trial court's findings of fact for substantial evidence. Merriman v. Cokeley, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). Substantial evidence is that which would persuade a fair-minded, rational person of the declared premise. Id. A reviewing court will not disturb findings of fact that are supported by substantial evidence, even if there is conflicting evidence. Id. Unchallenged findings are verities on appeal. Id. This court may affirm on any basis supported by the evidence. Ladenburg v. Campbell, 56 Wn. App. 701, 703, 784 P.2d 1306 (1990).

First, the appellants state that "[respondents'] counsel accused Mr. Moore of an intent to interact with the press," yet "there is no evidence to support this contention." They assert that "Mr. Moore had no interaction whatsoever with the press regarding the underlying motion."

The trial court found that "Ms. Koehler and Mr. Moore, or someone acting on their behalf, intentionally provided or alerted the media to the subject motion before serving Defendants." The plaintiffs filed the motion on June 18 at 1:26 p.m. By 1:55 p.m., before the respondents had been served, Rozier of King 5 News tweeted a screen capture of the motion. There is no evidence to suggest that someone outside of Koehler and Moore's firm had possession of the motion before it was provided to the media.[8] And, it is undisputed that the media had possession of it before it was served on the respondents. Koehler admits that she provided a copy of the motion to the media after filing. She does not specify when she did.

---

[8] There is no suggestion or evidence that employees at the King County Superior Court Clerk's Office provided copies of the motion to the media.

Moore states that he had "no role whatsoever in the press interaction regarding the perjury motion." Even if Moore himself did not provide a copy of the motion to the media, Koehler and Moore are the two attorneys of record on the motion. Substantial evidence supports the trial court's finding.

Second, the appellants contend that it was error for the trial court to conclude that "[appellants'] counsel had violated its protective order regarding the dissemination to the media."

The trial court found that "Ms. Koehler and Mr. Moore filed and disseminated to the public portions of Officer Anderson's video deposition before the time period for confidential designations had passed under this Court's Agreed Protective Order." The appellants attached portions of the transcript from Anderson's April 26, 2018 deposition to their perjury motion, along with corresponding video. Under the stipulated protective order, each party had 30 days from the date of receiving the transcript to designate portions of the transcript or exhibits thereto as confidential.

The trial court found that Anderson's counsel received the deposition video on May 29, 2018, and, as a result, had until June 28 to make confidential designations to the video. The appellants do not assign error to this finding of fact. Unchallenged findings of fact are verities on appeal. In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). The appellants filed the motion with portions of the transcript and video on June 18, 10 days before the June 28 deadline. Thus, Anderson had 10 more days to designate portions of the transcript or exhibits thereto as confidential. Deposition transcripts were treated as confidential until the

end of the 30 day period for making designations. As a result, substantial evidence supports the finding that the appellants violated the stipulated protective order by attaching portions of the deposition transcript and video to their motion.

Third, the appellants object to the trial court's finding that they filed the motion to garner media attention. The trial court found that the appellants "filed a baseless motion, lacking any support from the factual record or existing law . . . as a means of garnering media attention."

The appellants filed the perjury motion on June 18, 2018, the one year anniversary of Lyles's death. The media had a copy of the motion before it was served on the respondents. Koehler admits that she provided a copy to the media. After Rozier of King 5 News tweeted a screen capture of the motion, Koehler retweeted his post with the hashtags "#sayhername" and "#CharleenaLyles." She also retweeted several news articles regarding the case. And, she tweeted, "One year ago Charleena Lyles was shot to death in her own home by the police. Today we honor her memory and children by relentlessly fighting to uncover the truth of what happened." Based on these facts, substantial evidence supports the finding that the appellants filed the motion to garner media attention.

B. RPC 3.6

The appellants contend that Koehler did not violate RPC 3.6, and the trial court erred in finding that she did. They assert that her interactions fell within the provisions of RPC 3.6(b).

The trial court found that "Koehler's subsequent tweets/retweets of various news articles stand as extrajudicial statements of a party's credibility, character,

and reputation in violation of RPC 3.6. Such comments are materially prejudicial in light of the ongoing litigation." "[W]hether a given set of facts establish an RPC violation is a question of law." LK Operating, LLC v. Collection Grp., LLC, 181 Wn.2d 48, 68, 331 P.3d 1147 (2014). This court reviews questions of law de novo. Stone v. Sw. Suburban Sewer Dist., 116 Wn. App. 434, 438, 65 P.3d 1230 (2003).

RPC 3.6(a) provides,

> A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

Under RPC 3.6(b),

> Notwithstanding paragraph (a), a lawyer may state:
>
> (1) the claim, offense or defense involved, and, except when prohibited by law, the identity of the persons involved;
>
> (2) information contained in the public record;
>
> (3) that an investigation of a matter is in progress;
>
> (4) the scheduling or result of any step in litigation.

The appellants argue that the information Koehler retweeted to the media specifically falls under the safe harbor provisions of RPC 3.6(b). They note that the "information was contained in a public record – in this case the court filings and pleadings." And, they state that "the trial court's orders do not establish that there is a substantial likelihood that the trial would be materially prejudiced, particularly when the case is still in the discovery phase and trial is still months away."

To support their argument that Koehler violated RPC 3.6, the respondents cite comment 5 to the rule, which provides,

There are, on the other hand, certain subjects that are more likely than not to have a material prejudicial effect on a proceeding, particularly when they refer to a civil matter triable to a jury, a criminal matter, or any other proceeding that could result in incarceration. These subjects relate to:

(1) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness.

The perjury motion became a part of the court record when it was filed on June 18 at 1:55 p.m. GR 31(c)(4). At this point, the public could access it. GR 31(d)(1). There is no evidence to suggest that the media had a copy of the motion before it was filed. But, the deposition referenced in the motion was covered by a protective order. Portions of the deposition transcript and video were released 10 days before the deadline to designate any portion as confidential. As a result, Koehler's tweets about the motion were not within the safe harbor of RPC 3.6(b)(2) (allowing attorneys to state information in the public record).

Comment 5 to RPC 3.6 notes that statements about the character, credibility, or reputation of a party in reference to a civil matter triable by a jury are more likely than not to have a prejudicial effect on that proceeding. The plaintiffs alleged in their motion that Anderson had committed perjury during a deposition. They failed to serve the motion on the respondents before the media was provided with a copy. Thus, the respondents were unable to prepare a response, let alone have an opportunity to respond, before the media began posting about it.

16

Accordingly, Koehler reasonably should have known that her conduct would have a substantial likelihood of materially prejudicing the proceedings in this case.

The trial court did not err in determining that Koehler's interactions with the media violated RPC 3.6. However, this court is not a disciplinary body, and we are not concluding that Koehler violated RPC 3.6 in the context of a disciplinary proceeding. Rather, this conclusion is relevant to whether Koehler filed the motion for an improper purpose under CR 11.

C. CR 11

The appellants argue that the trial court abused its discretion in granting the respondents' request for CR 11 sanctions. CR 11(a) states,

> The signature of a party or of an attorney constitutes a certificate by that party or attorney that the party or attorney has read the pleading, motion, or legal memorandum, and that to the best of the party's or attorney's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is well grounded in fact; (2) it is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Where a party or attorney violates this rule, the court may impose appropriate sanctions upon the party or person who signed the pleading, motion, or legal memorandum, or both. Id.

CR 11 envisions two violations of the rule: filings that are not well grounded in fact and warranted by law, and filings that are made for an improper purpose. Bryant, 119 Wn.2d at 217. Before imposing CR 11 sanctions for a baseless filing,

the court must find that the attorney failed to conduct a reasonable inquiry into the factual and legal basis of the claim. Id. at 220. Courts use an objective standard in determining whether the attorney engaged in an appropriate inquiry. Stiles v. Kearney, 168 Wn. App. 250, 261-62, 277 P.3d 9 (2012). The court must make findings that specify the actionable conduct to impose CR 11 sanctions for a baseless complaint. Id. at 262. Namely, the court must make a finding that either (1) the claim was not grounded in fact or law and the attorney failed to perform a reasonable inquiry into the law or facts, or (2) the filing was made for an improper purpose. Biggs v. Vail, 124 Wn.2d 193, 201, 876 P.2d 448 (1994).

### 1. Well Grounded in Fact or Law

The appellants argue first that the perjury motion was supported by the factual record. The appellants alleged in the motion that "false statements made by Jason Anderson in his deposition support a charge of first degree perjury under RCW 9A.72.020."

To prove perjury in a criminal case, the State must meet strict requirements of proof. State v. Olson, 92 Wn.2d 134, 136, 594 P.2d 1337 (1979). First, it must present "[t]he testimony of at least one credible witness which is positive and directly contradictory of the defendant's oath." Id. Second, it must present "[a]nother such direct witness or independent evidence of corroborating circumstances of such a character as clearly to turn the scale and overcome the oath of the defendant and the legal presumption of his innocence." Id. "[T]he questions and answers which support the allegation must demonstrate both that the defendant was fully aware of the actual meaning behind the examiner's

18

questions and that the defendant knew his answers were not the truth." State v. Stump, 73 Wn. App. 625, 628, 870 P.2d 333 (1994).

The appellants point out that "Anderson consistently and repeatedly testified that he shot Charleena Lyles while [he] was backed up against a closed door." The respondents do not dispute this. And, McNew's deposition testimony did not contradict Anderson's testimony. Rather, he stated that he did not recall seeing him before shooting Lyles.

The appellants note that the diagram prepared in the CSI investigation did not show Anderson inside the apartment during the time of the shooting. This is true, but the diagram did not show him outside the apartment either. It omitted him entirely even though it is undisputed he was present at the scene. The CSI diagram does not positively and directly contradict Anderson's testimony that he shot Lyles from the doorway of her apartment while the door was closed.

To determine where Anderson was at the time of the shooting, the appellants hired Hayes to synchronize the hallway surveillance video and the audio from the officers' ICV systems. The synchronized video depicted "Anderson in the open doorway and the hallway at the only time that gunshots can be heard." In light of this discovery, the appellants filed their perjury motion.

But, the only evidence the appellants cite that contradicts Anderson's testimony is the synchronized video. Even if the video constitutes evidence that is "positive and directly contradictory" of Anderson's oath, the appellants cite no corroborating evidence "of such a character as clearly to turn the scale and

19

overcome the oath of the defendant." Olson, 92 Wn.2d at 136. This is required to prove perjury. See id.

Anderson's consistent testimony suggests that he firmly believed that the door was shut behind him during the shooting. Even if the synchronized video contradicted this testimony, it does not show that Anderson knew his answers were false. To prove perjury, the questions and answers supporting the allegation must demonstrate that "the defendant knew his answers were not the truth." Stump, 73 Wn. App. at 628. The video does not demonstrate this. Accordingly, the trial court did not abuse its discretion in determining that the perjury motion was not well grounded in fact, and the appellants failed to conduct a reasonable inquiry into its factual basis.

The appellants argue second that the motion was supported by existing law. They assert that they filed their motion "under a statute that is currently the law and has never been overturned." They also state that "[t]he absence of case law on this statute does not lend credence to [respondents'] assertion that the [appellants'] motion is legally unsupportable." In fact, they argue that "seeking sanctions based on unclear statutes or unsettled questions of law [is] inappropriate precisely because the chilling effect is too severe."

The appellants filed their motion under RCW 9.72.090. They argued that, under this statute, the trial court could order Anderson to appear to answer a perjury charge, and then refer the matter to a prosecuting attorney.

RCW 9.72.090 provides,

> Whenever it shall appear probable to a judge, magistrate, or other officer lawfully authorized to conduct any hearing, proceeding or investigation, that a person who has testified before such judge, magistrate, or officer has committed perjury in any testimony so given, or offered any false evidence, he or she may, by order or process for that purpose, immediately commit such person to jail or take a recognizance for such person's appearance to answer such charge. In such case such judge, magistrate, or officer may detain any book, paper, document, record or other instrument produced before him or her or direct it to be delivered to the prosecuting attorney.

We review questions of statutory interpretation de novo. City of Spokane v. Spokane County, 158 Wn.2d 661, 672-73, 146 P.3d 893 (2006). Our fundamental objective in interpreting a statute is to ascertain and carry out the legislature's intent. Smith v. Moran, Windes & Wong, PLLC, 145 Wn. App. 459, 463, 187 P.3d 275 (2008). Where the meaning of a statute is plain on its face, we give effect to the plain meaning. Id. If a statute is ambiguous, we look to outside sources, such as legislative history, to determine legislative intent. Id. at 463-64. We will not interpret a statute in such a way as to render any portion meaningless or that results in strained meanings or absurd consequences. Id. at 464.

It is apparent from the statute's plain language that its purpose is to allow the trial court to protect the integrity of proceedings before it. The statute authorizes a judge or other officer to act upon evidence presented at a hearing that a person has committed perjury or offered false evidence. RCW 9.72.090. Anderson had not testified before the trial court or submitted other evidence at the time the motion was made. The statute contemplates referral when the perjury was committed in a hearing in a judicial officer's presence. Id. (allowing a judge to

immediately commit to jail "a person who has testified before such judge [and] has committed perjury in any testimony"). That was not the case here.

The appellants' motion attempted to initiate a hearing and provide competing evidence that would establish perjury in order to obtain a referral for prosecution. Nothing in RCW 9.72.090 suggests that a party cannot call alleged perjury to the trial court's attention. But, it does not invite one party to set up another to refer for prosecution. Rather, it allows a judicial officer to make a referral of what that officer has witnessed as a means of deterring and sanctioning perjury.

Notably, the statute is not an evidentiary rule. If a party wishes to challenge the introduction of certain evidence on the basis that it is perjured testimony, that party may file a motion in limine to exclude that evidence. See Fenimore v. Donald M. Drake Const. Co., 87 Wn.2d 85, 91, 549 P.2d 483 (1976) (Holding that a trial court should grant a motion in limine if the motion "describes the evidence which is sought to be excluded with sufficient specificity to enable the trial court to determine that it is clearly inadmissible under the issues as drawn . . . and if the evidence is so prejudicial in its nature that the moving party should be spared the necessity of calling attention to it by objecting" to it at trial.). RCW 9.72.090 does not contemplate a party bringing a motion under the statute as a means of excluding evidence. Here, the appellants used RCW 9.72.090 as a sword to exclude evidence not yet presented to the trial court. This was not a proper use of the statute.

The appellants argue that they should not be sanctioned "for filing a novel motion – and seeking involvement of the superior court – even under these

unusual circumstances." But, they fail to explain how their decision to file the motion under RCW 9.72.090 aligns in any way with the clear language of the statute. No authority supports their action. It was novel, but it was also meritless. Accordingly, the trial court did not abuse its discretion in finding that the perjury motion is not supported by existing law, and the appellants failed to conduct a reasonable inquiry into the law.

2. Improper Purpose

The appellants argue next that the motion was not brought for an improper purpose. They explain that "[n]either Ms. Koehler nor Mr. Moore sought the perjury ruling for any other reason other than the belief that a crime had been committed." While they concede that the motion was a "novel use of the statute," they assert that "the unique or atypical nature of the motion does not suggest an improper purpose."

The appellants contend that a finding of improper purpose must be based on "evidence of bad intent." They rely on In re Cooke, 93 Wn. App. 526, 969 P.2d 127 (1999). There, this court affirmed the trial court's finding that a statement of issues was not well grounded in fact and was interposed for improper purposes, including harassment of an opposing party. Id. at 529. The court noted that "Cooke failed to produce any evidence to support the assertions outlined in the statement of issues, despite extensive discovery." Id. It also found that Cooke "threatened to destroy Burgner and force her to incur substantial legal costs." Id. It held, "This evidence amply supports the court's award of fees." Id.

23

Here, the trial court's finding of an improper purpose included not just the purpose of harassment, but of "generat[ing] media attention, inflam[ing] the public, and materially prejudic[ing] these proceedings." The perjury motion was filed on June 18, 2018, the one year anniversary of Lyles's death. The media had a copy of the motion before it was served on the respondents. Koehler admits that she provided a copy to the media. She retweeted a screen capture of the motion by a member of the media with the hashtags "#sayhername" and "#CharleenaLyles." She retweeted news articles from three news outlets regarding the case. And, she tweeted, "One year ago Charleena Lyles was shot to death in her own home by the police. Today we honor her memory and children by relentlessly fighting to uncover the truth of what happened."

Also, as established above, the appellants filed the motion and provided it to the media in violation of the stipulated protective order. They filed the motion on June 18, even though Anderson's counsel had until June 28 to make confidential designations to the deposition video. Nowhere is there any explanation why the credibility attack or perjury claim was so urgent that it could not have been raised in due course at trial when the evidence was presented. Under these facts, the trial court did not abuse its discretion in finding that the motion was filed for an improper purpose.[9]

---

[9] The appellants also contend that the trial court's findings are insufficient to impose sanctions. As stated above, the trial court must make findings that specify the actionable conduct to impose CR 11 sanctions for a baseless complaint. Stiles, 168 Wn. App. at 262. Namely, it must make a finding that either (1) the claim was not grounded in fact or law and the attorney failed to perform a reasonable inquiry into the law or facts, or (2) the filing was made for an improper purpose. Biggs, 124 Wn.2d at 201. The trial found that "Ms. Koehler and Mr.

III.  ER 702 and Frye

As noted above, even if Hayes's declaration and video were improperly excluded, the evidence was not necessary to evaluate the CR 11 sanctions. It is nonetheless an issue that merits review, because the ruling has implications for the trial.

The appellants argue that Hayes's declaration respecting his synchronized video of the shooting satisfied the requirements of ER 702 and Frye. The respondents moved to strike Hayes's synchronized video, along with his declaration, under ER 702 and Frye.[10] Hayes concluded in his declaration that "[t]he synchronized video and audio accurately depict Officer Anderson in the open doorway of the apartment and the hallway at the only time that gunshots can be heard." The trial court found that "Hayes'[s] synchronization video, Ex. 10 to Ms. Koehler's declaration, is not reliable or credible expert evidence meeting the requirements of Frye or ER 702." As a result, it granted the respondents' motion to strike.

---

Moore's motion has no basis in existing law or the facts of this case," and that the motion "lacks good faith arguments and serves no purpose other than to harass Defendants, generate media attention, inflame the public, and materially prejudice these proceedings and defendant's right to a fair trial." These findings provide a proper inference and are sufficient.

[10] It is unclear if the respondents intended to strike this evidence only in the context of the appellants' perjury motion, or intended to strike it from the trial record as a whole. The question of its admissibility is separate from the issue of CR 11 sanctions. Accordingly, we construe the respondents' motion as a motion to strike the evidence from the trial record.

25

"Under Frye, the primary goal is to determine whether the evidence offered is based on established scientific methodology." State v. DeJesus, 7 Wn. App. 2d 849, 859-60, 436 P.3d 834, review denied, 193 Wn.2d 1024 (2019). To do so, the court considers "(1) whether the underlying theory is generally accepted in the scientific community and (2) whether there are techniques, experiments, or studies utilizing that theory which are capable of producing reliable results and are generally accepted in the scientific community." State v. Riker, 123 Wn.2d 351, 359, 869 P.2d 43 (1994). This court reviews questions of admissibility under Frye de novo. Anderson v. Akzo Nobel Coatings, Inc., 172 Wn.2d 593, 600, 260 P.3d 857 (2011).

A trial court must exclude expert testimony involving scientific evidence unless it satisfies ER 702. L.M. v. Hamilton, 193 Wn.2d 113, 134, 436 P.3d 803 (2019). "Expert testimony satisfies ER 702 if (1) 'the witness qualifies as an expert,' and (2) 'the testimony will assist the trier of fact.'" Id. (quoting Lakey v. Puget Sound Energy, Inc., 176 Wn.2d 909, 918, 296 P.3d 860 (2013)). "A witness may qualify as an expert 'by knowledge, skill, experience, training, or education.'" Id. at 135 (quoting ER 702). "An expert may not testify about information outside his area of expertise." In re Marriage of Katare, 175 Wn.2d 23, 38, 283 P.3d 546 (2012). This court reviews ER 702 challenges for abuse of discretion. L.M., 193 Wn.2d at 118.

In their motion, the respondents argued that Hayes is not a "video analysis expert," and "his own website fails to identify video analysis or synchronization as an area of expertise." They pointed out that Hayes did not use original footage in

creating the video, "but conducted his analysis via the redacted and publicly released video created by SPD." They also cited a declaration by Travis Smith, a video specialist employed by SPD. In his declaration, Smith explained the problems with using a redacted video to conduct such a synchronization:

> In simple terms, using the redacted video file for a forensic comparison is similar to comparing a photocopy of a photocopy to the original image. The original videos were processed for redaction and conformed to fit one video format, which included changes in frame size, frame rate, and file formats, converting or processing, and then redacting, transcoding, and exporting for public release at the request of our media relations unit, who in turn uploaded it to [YouTube,] which includes another proprietary transcoding process. Each of these steps is a figurative "photocopy" of the original video file.

He further explained,

> [T]he change in the fundamental traits of the original video through the process of re-encoding multiple times (photocopies of photocopies) alters the integrity of the video in terms of forensic analysis, because of changes in frame rates, frame size, and the loss or addition of video information created in the transcoding process and encoding settings in general. A better way to analyze is to use the original footage in the analysis and synchronization of video and audio, even still with the existence of many variables.

In striking the video and declaration, the trial court found,

> Mr. Hayes is not a video analyst. The synchronization authored by Mr. Hayes and offered to this Court did not utilize original audio or video files. Instead, Mr. Hayes used redacted video and audio files from the publicly released video created by SPD. At this stage in the proceedings, the court does not find Mr. Hayes'[s] methods to be reasonable or reliable.

First, Hayes described his methodology in synchronizing the audio and video files:

> AVS Video Editor 7.4 . . . was used to synchronize the video and audio clips that were produced by the City of Seattle in discovery.

Specifically, audio and video files were manually synced by matching the sound from the dash cam and the ICV microphones. The frequency of the specific sound used to locate the synchronization point can be graphically displayed and the "soundprint" can be matched for each recording to be synchronized. Typically, we look for additional sounds that match in frequency at other points in in [sic] the recordings to verify the synchronization. That was done here. The ICV microphone audio signal did not cover the full time period that the dash cam covered (four minutes and seven minutes, respectively). Thus, three separate clips from the ICV microphones were isolated and matched to the dash cam audio. When syncing, during the times the ICV microphones audio was used, dash cam audio was turned off to avoid hearing the in-vehicle radio traffic. The hallway surveillance video was also manually synced by coordinating the act of the officer knocking on the door to the sound of the knock in the dash cam video.

"The Frye test is implicated only where the opinion offered is based upon novel science." Anderson, 172 Wn.2d at 611. In their Frye challenge, the respondents did not take issue with synchronization as novel science. Nor did they argue that Hayes's methodology, described above, is not generally accepted by the relevant scientific community. Rather, they argued that Hayes should have used original footage instead of "the redacted and publicly released video created by SPD." The respondents' expert, Smith, stated that "the process Mr. Hayes describes as 'Careful observation of the recordings' is an acceptable method to create a rudimentary depiction of a chain of events." We conclude that Frye was not implicated in this case. The trial court erred in excluding the evidence on that basis.

Second, Hayes's testimony laid the necessary foundation for his expertise in video synchronization. Hayes stated in his declaration that he is a "biomechanical engineer with more than 40 years of combined academic and

28

forensic experience." He explained, "It is reasonable and customary in my field to synchronize files like the ones I reviewed here." And, he stated,

> Synchronization is defined as coordinating or matching two or more activities, devices or processes in time. . . . Synchronization of multiple video recordings has been used for applications such as object tracking, 3D scene rendering, and noise reduction. I have performed numerous similar synchronizations or supervised my staffers in doing so. Based upon this experience, my education, and work as an engineer, I believe that I am qualified and able to accurately conduct such synchronizations.

The respondents argue that Hayes is not a "video analysis expert," citing his failure to identify video analysis or synchronization as areas of expertise on his website. But, the fact that Hayes's website does not list video synchronization or analysis as areas of expertise does not rebut or disprove the training and experience to which he testified. The respondents' argument that Hayes should have used original footage goes to the weight of the evidence, not its admissibility.

Hayes qualifies as an expert under ER 702 on the basis of experience. The trial court abused its discretion in excluding the evidence on that basis. Accordingly, the trial court erred in excluding Hayes's video and declaration under ER 702 and Frye.

## IV. First Amendment

The appellants argue last that the trial court's orders violated their First Amendment rights. Specifically, they argue that "[i]t is a well-developed principle of both state and federal constitutional law that efforts to restrict counsel's communication with the media violate First Amendment principles." This court

reviews constitutional issues de novo. <u>State v. Clark</u>, 187 Wn.2d 641, 649, 389 P.3d 462 (2017).

The appellants rely on <u>State v. Bassett</u>, 128 Wn.2d 612, 911 P.2d 385 (1996). There, the State Supreme Court found that a trial court's order forbidding all counsel from publicly discussing an aggravated first degree murder case was a "prior restraint on the exercise of free speech." <u>Id.</u> at 613, 615. Because there were several alternatives to the order, and there was no indication that the alternatives would be inadequate, it held that the order was unnecessary. <u>Id.</u> at 618. It also determined that the order was "not narrowly tailored to proscribe only those statements that threaten Bassett's right to a fair trial or the administration of justice." <u>Id.</u> Therefore, the court vacated the order. <u>Id.</u>

<u>Bassett</u> is easily distinguishable. Here, the trial court did not enter an order forbidding Koehler and Moore from publicly discussing the case. It approved a stipulated protective order to prevent the public release of material designated as confidential. As established above, the appellants violated this order in filing the motion and providing a copy to the media. Thus, the trial court did not impose a prior restraint on the appellants' free speech. Rather, it sanctioned them under CR 11 for violating a stipulated court order, concluding in part that "Koehler's subsequent tweets/retweets of various news articles stand as extrajudicial statements of a party's credibility, character, and reputation in violation of RPC 3.6. Such comments are materially prejudicial in light of the ongoing litigation."

The appellants contend that "[d]espite the absence of [an order regarding media contacts], the judge entered sanctions against Plaintiffs' counsel which

punished Ms. Koehler for media contacts, and violated her free speech rights." They cite no authority for this proposition. They further state that Koehler did not violate RPC 3.6 "because her actions created no demonstrable substantial likelihood that the trial of the case would be materially prejudiced." In the absence of such proof, they argue that "RPC 3.6 as applied to her was unconstitutional." But, the trial court found that Koehler's comments were "materially prejudicial in light of the ongoing litigation." Substantial evidence supports that finding. The trial court did not err in concluding that her actions violated RPC 3.6.

In light of the stipulated protective order, the trial court did not violate the appellants' First Amendment rights in imposing sanctions.

We affirm the imposition of sanctions, but reverse as to the trial court's evidentiary ruling excluding the expert.

Appelwick, C.J.

WE CONCUR:

Andrus, J.          Mann, A.C.J.